# Shiver & Nelson
## Document Investigation Laboratory, Inc.

1903 Lilac Ridge Drive
Woodstock, GA 30189
770-517-6008
Fax: 678-494-9283

# Forensic Document Examination Report
### Laboratory File No. 14-2528

Prepared For:

Mr. Bobby C. Aniekwu
Law Offices of Bobby C. Aniekwu & Associates
127 Peachtree Street, N.E. Suite 1330
Atlanta, GA 30303-1800

Re: MetLife and Annuity Company of Connecticut, Plaintiff v. Uzo Akpele; J.E.A. (a minor); and Ann Herrera (in her capacity as temporary administrator of The Estate of Ignatius Esekhaigbe Akpele, Defendants; Uzo Akpele and J.E.A. (a minor), Counter-Claimants v. MetLife and Annuity Company of Connecticut, Counter-Claim Defendant; United States District Court, for the Northern District of Georgia, Atlanta Division, Civil Action File No. 1:13-cv-03898-TWT

## A. Documents Submitted for Examination:

### Questioned Document:

Q1(1-9) – Travelers Insurance Company documents pertaining to Ignatius Akpele, dated 5/4/05 and 4/27/05.

### Known writing samples of Mr. Ignatius Akpele:

K1(1-7) – Purchase and Sale Agreement, along with associated documents, dated 10/27/04.

K2(1-3) – Met Life document, dated 10/11/2000, Bates numbers Akpele 0863, 0864, 0865.

K3(1-2) – Oppenheimer Annuity Purchase Client Acknowledgment Letter, dated 9/21/10 or possibly 9/26/10.

K4(1-2) – 1-4 Family Rider, dated 4/24/95.

Shiver & Nelson Document Investigation Laboratory, Inc.
Report to: Mr. Bobby C. Aniekwu
Lab. File No. 14-2528
Page 2 of 4 Pages

K5(1-10) – Security Deed, Planned Unit Development Rider, and a Waiver of Borrower's Rights, all dated 5/6/99.

K6(1-23) – Security Deed, Planned Unit Development Rider, Fixed/Adjustable Rate Rider, and an Acknowledgement and Waiver of Borrower's Rights, all dated 12/9/05.

K7(1-18) – Security Deed and a Planned Unit Development Rider, both dated 10/21/09.

K8(1-18) – Security Deed, a Second Home Rider, and an Acknowledgement and Waiver of Borrower's Rights, all dated 6/10/05.

**B. Determinations Requested:**

It was requested that I attempt to determine whether Mr. Ignatius Akpele wrote the purported Ignatius Akpele initials on the right side of Section 17 of Document Q1(6), hereinafter referred to as the questioned initials.

**C. Opinions:**

1. In my professional opinion, Mr. Akpele did not write the questioned initials.

2. In my professional opinion, there are indications Mr. David M. Hilsman may have written the questioned initials.

**D. Bases and Reasons for Opinions:**

1. All of the submitted documents are machine copies. Mr. Aniekwu submitted documents Q1(1-9), K1(1-7), K2(1-3) and K3(1-2). I located Documents K4(1-2) through K8(1-18) on the Georgia Superior Court Clerk's Cooperative Authority website and with Mr. Aniekwu's permission, these documents were used as known writing samples of Mr. Akpele.

2. Examination of the initials of Mr. Akpele on the known documents disclosed that the documents span a time period from April 24, 1995 to September 21, 2010. During that time period, Mr. Akpele maintained a generally consistent style for his initials (within a range of natural variation). Further, Documents K1(1-7), K6(1-23), and K8(1-18) are dated within a year of the date on Document Q1(6).

Shiver & Nelson Document Investigation Laboratory, Inc.
Report to: Mr. Bobby C. Aniekwu
Lab. File No. 14-2528
Page 3 of 4 Pages

3. Comparison of the questioned initials to the known initials of Mr. Akpele disclosed that the questioned initials are totally inconsistent with the known initials.  I found no evidence that the initials were written by Mr. Akpele.  I also found no evidence that anyone was attempting to simulate (imitate) the style of Mr. Akpele's initials or portions of his signature.

4. The findings above provide the bases for my professional opinion that Mr. Akpele did not write the questioned initials.

5. During the course of my examination, I observed a strong similarity between the questioned initials and the signature of Mr. David M. Hilsman on Document Q1(9).  This similarity is particularly evident in the form of the letter "D" and the manner of ending his first name (presumably the upper extender of the letter "d"), as well as the height relationship between these two characters.  The formation of the letter "D" can also be seen in his printed name below the signature.

6. These findings in the paragraph above provide the bases for my professional opinion that Mr. Hilsman may have written the questioned initials.  Furthermore, it is possible that Mr. Hilsman was writing his own initials; however, I have no samples of Mr. Hilsman's initials to use for comparison.  Limitations during this portion of my examination include the very small known writing sample for Mr. Hilsman.

**E. Notes:**

1. In accordance with Rule 26 of the Federal Rules of Civil Procedure, the following additional information is provided:

    a. A copy of my *curriculum vitae*, which includes a list of my publications and presentations for the previous ten years, is attached to this report as Exhibit A.

    b. A list of my testimonies and depositions for the previous four years is attached to this report as Exhibit B.

    c. My fee schedule is attached to this report as Exhibit C.  To date, I have been paid a retainer of $1000.00.  This retainer allows for five hours work.  My hourly rate is $200.00 per hour.  At the time of this report, I had worked a total of approximately 6 to 7 hours on this matter.

Shiver & Nelson Document Investigation Laboratory, Inc.
Report to: Mr. Bobby C. Aniekwu
Lab. File No. 14-2528
Page 4 of 4 Pages

2. My handwriting comparisons were conducted in accordance with ASTM Standard E 2290-07a, *Standard Guide for Examination of Handwritten Items,* which describes the methodology for forensic handwriting comparisons. A copy of this standard is attached to this report as Exhibit D.

3. My opinions in this matter are given in accordance with ASTM Standard E 1658-08, *Standard Terminology for Expressing Conclusions of Forensic Document Examiners.* A copy of this standard is attached to this report as Exhibit E.

4. Copies of the questioned documents and known writing samples are attached to this report as Exhibit F. Documents Q1, K1, K2, and K3 were returned to Mr. Aniekwu with this report.

Completed this _____ 16ᵗʰ _____ day of _____ September _____ , 2014.

Farrell C. Shiver
Forensic Document Examiner

Exhibit A

# Shiver & Nelson
## Document Investigation Laboratory, Inc.

1903 Lilac Ridge Drive
Woodstock, GA 30189
770-517-6008
Fax: 678-494-9283

## CURRICULUM VITAE

### Farrell C. Shiver
### Forensic Document Examiner

**Education:**

- Master of Science, Troy State University, Alabama; Criminal Justice, 1983
- Bachelor of Science, Jacksonville State University, Alabama; Law Enforcement, 1976

**Professional Certification:**

- American Board of Forensic Document Examiners (ABFDE), certified by testing in 1993, Certificate No. 266; Recertified in 1998, 2003, 2008 and 2013

**Professional Affiliations:**

- American Society of Questioned Document Examiners (ASQDE), Member
- American Academy of Forensic Sciences, Questioned Document Section, Member
- Southeastern Association of Forensic Document Examiners (SAFDE), Member
- Committee E30 on Forensic Sciences, ASTM International, Member

**Current Positions of Professional Contribution:**

- Board of Directors, American Board of Forensic Document Examiners
  - Member, Credentials Committee
  - Member, Rules and Procedures Committee
  - Member, Continuing Education Committee
  - Member, Forensic Science Accreditation Board Committee
  - Member, Nominating Committee
- Nominating Committee, American Society of Questioned Document Examiners
- Participant, Collaborative Testing Services Proficiency Testing Program

**Previous Positions of Professional Contribution:**

- President, Vice President, Treasurer, and a Director of the ASQDE
- Editor, Journal of the American Society of Questioned Document Examiners

**Curriculum Vitae of Farrell C. Shiver, Forensic Document Examiner**
**Shiver & Nelson Document Investigation Laboratory, Inc.**
**Page 2 of 9 Pages**

- Chairman, Scientific Working Group for Forensic Document Examination (SWGDOC) Subcommittee on Standard Operating Procedures and Terminology
- Chairman of the Finance Committee, the Ethics Committee, and the Strategic Planning Committee, ASQDE
- Member of the Evaluation Chairman of the Finance Committee, the Ethics Committee, and the Strategic Planning Committee, ASQDE
- and Examination Committee and the Journal Committee, ASQDE
- Member, Executive Committee, SWGDOC
- Editor, SAFDE Newsletter, Chairman of the SAFDE Awards Committee, Co-Chairman of the Program Committee
- Member, ABFDE Strategic Planning Committee
- Questioned Documents Subcommittee, ASTM International, Member

**Professional Experience:**

Since 1999, a Forensic Document Examiner in private practice in Woodstock, Georgia, a suburb of Atlanta. Clientele includes attorneys, investigators, corporations, government agencies, and private individuals.

Retired as a Forensic Document Examiner in the United States Army Criminal Investigation Laboratory, Fort Gillem, Georgia. Held positions as Chief of the Questioned Documents Division, as well as Training Officer and Quality Assurance Officer in the Questioned Document Division.

Completed examinations of more than 100,000 items of documentary evidence in over 2,700 civil and criminal cases.

Provided sworn testimony as an expert witness in the field of Forensic Document Examination on more than 140 occasions in federal, state, and military courts, as well as administrative hearings. Provided testimony by deposition on more than 45 occasions.

**Qualification Training:**

Graduate of the U.S. Army's Forensic Document Examination Course (1989-1991). This is a two-year resident training program designed to prepare the graduate to serve as an expert witness in the areas of handwriting and hand printing comparison, typewriting, computer printed documents, machine copies, decipherment of altered, obliterated and charred documents, laboratory examinations of inks and paper, decipherment of erased

**Curriculum Vitae of Farrell C. Shiver, Forensic Document Examiner**
**Shiver & Nelson Document Investigation Laboratory, Inc.**
**Page 3 of 9 Pages**

entries and indented writings, detection of counterfeit currency, examination of
commercially printed matter and the use of related instrumentation.

**Instructional Experience:**

Former Training Officer, Questioned Documents Division, U. S. Army Criminal
Investigation Laboratory.  Responsible for administering the laboratory's two-year course
of instruction in forensic document examination.  Lectured on numerous occasions on the
subject of forensic document examination to groups of investigators, attorneys, and
students from federal, state, military, and private organizations.

**Additional Training Courses, Seminars, and Conferences:**

- Annual conferences of the American Society of Questioned Document Examiners
  (ASQDE), American Academy of Forensic Sciences (AAFS), Southeastern
  Association of Forensic Document Examiners (SAFDE), and International
  Association for Identification, Georgia State Division.
- Federal Bureau of Investigation (FBI) - Advanced Techniques of Document
  Examination for Laboratory Personnel - Typewriters and Other Printing Devices
- FBI - Fundamentals of Document Examination for Laboratory Personnel
- U.S. Secret Service Questioned Document Course
- American Board of Forensic Document Examiners (ABFDE) - Examination
  Techniques in Handwriting and Rubber Stamp Cases Workshop
- Second International Symposium on the Forensic Examination of Questioned
  Documents
- Rochester Institute of Technology - Orientation to the Graphic Arts
- Mead Corporation - Paper Knowledge Course
- ABFDE - Canon Photocopier, Facsimile, and Microfilm Training Workshop
- ABFDE - Business Records Workshop
- ASQDE - Fine and Subtle Features of Handwriting Workshop
- ASQDE - Photocopier Identification Workshop
- ASQDE - Difficult Handwriting Problems Workshop
- ASQDE - Typewriter Classification and Identification Workshop
- ASQDE - Laser Printer Workshop
- ASQDE - Miscellaneous Document Examination Workshop
- ASQDE - Typography Workshop
- ASQDE - Conclusion Scale and Logical Inference Workshop

Curriculum Vitae of Farrell C. Shiver, Forensic Document Examiner
Shiver & Nelson Document Investigation Laboratory, Inc.
Page 4 of 9 Pages

- ASQDE - Forensic Examination of Digital Signatures Workshop
- ASQDE - Challenging Signatures Workshop
- ASQDE - Individuality of Inkjet Printing Workshop
- ASQDE & AAFS - Various Signature and Handwriting Workshops
- AAFS - Fraudulent Documents: Their Recognition Workshop
- AAFS - Fraudulent Documents: Their Deterrence Workshop
- AAFS - Digital Forensic Photography
- AAFS - Practical Digital Photography Workshop
- SAFDE - The Examination of Photocopied Signatures; Distinguishing Between Line Quality and Ink Line Morphology Workshop
- SAFDE - The Use of the Haas Atlas CD Compilation Workshop
- SAFDE - Rubber Stamp Plant Tour and Workshop
- SAFDE - Typewriter Identification Workshop
- SAFDE - Signature Workshop
- SAFDE - Difficult Handwriting Workshop
- SAFDE - Fine and Subtle Elements of Handwriting Workshop
- SAFDE - Forensic Examinations of Typographic Documents Workshop
- SAFDE - Examining Documents throughout the Spectrum Workshop
- SAFDE - Production of Genuine Security Documents & the Detection of Counterfeit Documents Workshop
- SAFDE - Disguised Handwriting: An Interactive Workshop
- SAFDE – Electronic Signatures Workshop
- Association of the Pulp and Paper Industry - Papermaking: The Process and the Product
- Canon Corporation - Photocopier Workshop for Law Enforcement
- Canon Corporation - NP4835 Photocopier Technician's Course
- Canon Corporation - Facsimile Machine Workshop
- Image Enhancement Applications Training
- Imaging and Forensics: New Technologies Workshop
- Bar Code Basics Seminar
- Illinois State Police Laboratory - Fracture Match Workshop
- Tours of U.S. Bureau of Engraving and Printing, paper mills, check printing and rubber-stamp producing facilities.

**Specialized Laboratory Capabilities:**

- Microscopy and Photomicrography

**Curriculum Vitae of Farrell C. Shiver, Forensic Document Examiner**
**Shiver & Nelson Document Investigation Laboratory, Inc.**
**Page 5 of 9 Pages**

- Video Spectral Comparison with the Foster & Freeman VSC4c for non-destructive testing of inks using infrared reflectance and infrared luminescence techniques
- Electrostatic Document Imaging with the Foster & Freeman ESDA[2] for the detection and development of visible writing impressions and invisible writing images
- Color Computer Imaging and Enhancement

**Related Employment:**

Nov 1999 through Present – Forensic Document Examiner, Shiver & Nelson Document Investigation Laboratory, Inc., Woodstock, GA.

Mar 1991 through Nov 1999 – Forensic Document Examiner (and Special Agent), United States Army Criminal Investigation Laboratory, Fort Gillem, GA

Mar 1989 through Mar 1991 – Student Forensic Document Examiner, (and Special Agent), United States Army Criminal Investigation Laboratory, Fort Gillem, GA.

Mar 1986 through Mar 1989 – Special Agent, U.S. Army Criminal Investigation Command (CID), Wuerzburg, Germany, with duties as an investigative team chief.

Oct 1983 through Mar 1986 – Special Agent, U.S. Army CID, Fort Ord, CA, with duties as an investigative team chief.

Apr 1981 through Oct 1983 – Special Agent, U.S. Army CID, Fort Benning, GA, with duties as a criminal investigator.

**Publications and Presentations:**

"Line Intersections," article in the *Wiley Encyclopedia of Forensic Science*, John Wiley & Sons, Ltd, Chichester, United Kingdom, 2009.

*Scientific Examination of Questioned Documents, 2nd Edition,* CRC Press, 2006. Chapter 26, "Accidental Markings and Indented Writings on a Document." Revised chapter previously written by Ordway Hilton.

*Nondestructive Differentiation of Full-Color Photocopies*, presented at the 1991 conference of the American Academy of Forensic Sciences and published by the Journal of Forensic Sciences, January 1991 (co-author).

**Curriculum Vitae of Farrell C. Shiver, Forensic Document Examiner**
**Shiver & Nelson Document Investigation Laboratory, Inc.**
**Page 6 of 9 Pages**

*Dry Transfer Lettering and the Anonymous Note*, presented at the 1991 conference of the American Society of Questioned Document Examiners (co-author).  Published in *Indagaciones Documentales*, Ediciones La Roca, Buenos Aires, Argentina, 2008 (Spanish language book).

*Photocopier Identification: Discussion of a Problem Associated with Multi-Generation Photocopies*, presented at the 1994 conference of the American Society of Questioned Document Examiners. Published in *Indagaciones Documentales*, Ediciones La Roca, Buenos Aires, Argentina, 2008 (Spanish language book).

*Starzecpyzel Rationale Used to Decide U.S. v. Ruth*, published by the ABFDE News, October 1995 (co-author).

*An Examination of Dry Transfer Lettering as it Related to the Case of an Anonymous Letter*, presented at the 1989 conference of the Southeastern Association of Forensic Document Examiners.

*Chemical Enhancement of Faint NCR Paper Writing Images*, presented at the 1990 conference of the American Society of Questioned Document Examiners and the 1990 conference of the Southeastern Association of Forensic Document Examiners.

*Off-set Marks and Printing Ink Smears, How Reliable in the Identification of a Photocopy to an Original Document?* Presented at the 1991 conference of the Southeastern Association of Forensic Document Examiners.

*NCR Paper, Damage Detection Agent and the Latent Print Examiner*, presented at the 1991 conference of the Georgia State Division of the International Association for Identification.

*Questioned Document Training in the U.S. Army Criminal Investigation Laboratory*, presented at the 1992 conference of the American Academy of Forensic Sciences.

*Was the Second Page Inserted?* Presented at the 1992 conference of the Southeastern Association of Forensic Document Examiners.

*Additional Applications for Damage Detection Agent for CB Coatings*, presented at the 1992 conference of the American Society of Questioned Document Examiners.

Curriculum Vitae of Farrell C. Shiver, Forensic Document Examiner
Shiver & Nelson Document Investigation Laboratory, Inc.
Page 7 of 9 Pages

*RAW O?  How to Construct an Inexpensive Device to Assist in the Reading of Typewriter Ribbons,* presented at the 1993 conference of the Southeastern Association of Forensic Document Examiners.

*Subject A or Subject B?* Presented at the 1994 conference of the Southeastern Association of Forensic Document Examiners.

*A Guide for Civilian Document Examiners Testifying in Courts-Martial,* presented at the 1995 conference of the American Academy of Forensic Sciences.

*The New Military Identification Card,* presented at the 1995 conference of the Southeastern Association of Forensic Document Examiners.

*Case Report: The Value of Field Assistance to the Investigator in a Counterfeit Check Case,* presented at the 1996 conference of the Southeastern Association of Forensic Document Examiners.

*Case Report: The Individuality of Handwriting Demonstrated through the Field Screening of 1000 Writers,* presented at the 1996 conference of the American Society of Questioned Document Examiners.

*The "Expert" Critic,* presented at the 1997 conference of the American Society of Questioned Document Examiners.

*Examination of the Postal Identification Tag,* presented at the 1998 conference of the Southeastern Association of Forensic Document Examiners.

*A Comparison of the FontFinder and FontExpert Typeface Recognition Programs,* presented at the 1999 conference of the Southeastern Association of Forensic Document Examiners.

*Risograph Revisited,* presented at the 2000 conference of the Southeastern Association of Forensic Document Examiners.

*What's the Difference?* Presented at the 2001 conferences of the American Society of Questioned Document Examiners and the Southeastern Association of Forensic Document Examiners.

**Curriculum Vitae of Farrell C. Shiver, Forensic Document Examiner**
**Shiver & Nelson Document Investigation Laboratory, Inc.**
**Page 8 of 9 Pages**

*Forensic Document Examination in Medical Malpractice Cases*, presented at the Medical Malpractice Institute, Sea Island, GA, November 16, 2001.

*Secondary Impressions from Mailing Envelopes*, presented at the 2002 conference of the American Academy of Forensic Sciences.

*Daubert in the SAFDE States*, presented at the 2003 conference of the Southeastern Association of Forensic Document Examiners.

*Daubert in the State Courts*, presented at the 2003 conference of the American Society of Questioned Document Examiners.

*The Electrostatic Decipherment of a Liquid-Damaged Ink Entry,* presented at the 2004 conference of the Southeastern Association of Forensic Document Examiners.
*Daubert in the SAFDE States - 1st Update*, presented at the 2004 conference of the Southeastern Association of Forensic Document Examiners.

*A Comparison of the $ESDA^2$ to the ESDA: Including an Evaluation of the Toner Application Device (TAD) Method vs. Cascade Development Method*, presented at the 2005 conference of the Southeastern Association of Forensic Document Examiners.

*The Forensic Examination of Documents Produced by Computer Printers, Facsimile Machines, and Photocopiers*, presented at the 2006 CyberCrime Summit at Kennesaw State University, GA.

*Daubert in the SAFDE States - 2nd Update*, presented at the 2006 conference of the Southeastern Association of Forensic Document Examiners.

*Paper Basis Weight and the Creation of Secondary Impressions*, presented at the 2007 conference of the Southeastern Association of Forensic Document Examiners.

*A Current Look at the Pitfalls in the Use of Ultraviolet Examination to Differentiate between Writing Papers*, presented at the 2007 conference of the Southeastern Association of Forensic Document Examiners.

*Forensic Document Examination for Attorneys*, presented at the 17th Annual Criminal Practice Seminar, Kennesaw, GA, February 19, 2010.

**Curriculum Vitae of Farrell C. Shiver, Forensic Document Examiner**
**Shiver & Nelson Document Investigation Laboratory, Inc.**
**Page 9 of 9 Pages**

*Forensic Document Examination for Private Detectives and Security Agents*, presented at the Georgia Private Detective and Security Agent Continuing Education Course, Duluth, GA, August 26, 2011.

*The FDE Only Page: A Resource for Forensic Document Examiners*, presented at the 2012 conference of the Southeastern Association of Forensic Document Examiners.

*Visualization of a Liquid-Damaged Ink Entry Using an Electrostatic Detection Device*, presented at the 2012 conference of the American Society of Questioned Document Examiners.

*Merry Christmas from Babe Ruth*, presented at the 2013 conference of the Southeastern Association of Forensic Document Examiners.

*Cut-and-Paste Manipulation of a Quitclaim Deed*, presented at the 2014 conference of the Southeastern Association of Forensic Document Examiners.

*Forensic Document Examination for Private Detectives*, presented a monthly meeting of the Georgia Association of Professional Private Investigators, Atlanta, Georgia, June 10, 2014

Exhibit B

# Shiver & Nelson
## Document Investigation Laboratory, Inc.

1903 Lilac Ridge Drive
Woodstock, GA 30189
770-517-6008
Fax: 678-494-9283

### TESTIMONIES OF FARRELL C. SHIVER
### SINCE SEPTEMBER 1, 2010

| Date | Case | Type |
|------|------|------|
| 09/08/11 | Estate of Marjorie W. Hamrick, Probate Court of Glynn County, GA, before Probate Judge Debra G. Howes, Estate No. PRO16335 | Hearing |
| 09/27/11 | Estate of David Wayne McKinney, Probate Court of Bartow County, GA before Probate Judge Mitchell Scoggins, Estate No. M-205E | Hearing |
| 10/04/11 | Mary Bean, Administratrix of the Estate of Willis Frank Robertson, Deceased v. Ireneo Domingo, Jr., M.D. et al., Circuit Court for Bullock County, Alabama, Case No. CV-08-900001 | Deposition |
| 10/21/11 | Richard and Julia Lynch v. Kathy L. Schwock, M.D., Joe P. Lester, III, D.O., Gwinnett Anesthesia Service, P.C.. Joe Doe Corporation; and Gwinnett Hospital System, Inc., State Court of Gwinnett County, GA, Civil Action File No. 10C-04132-5 | Deposition |
| 05/09/12 | In Re: Estate of Vernon Forrest, Deceased, Brittney Anderson, Alphonso Forrest, Mildred Forrest, Counter-Petitioners, v. Eurica Green and Jerome L. Wolf, as Personal Representative of the Estate of Vernon Forrest, Circuit Court of the 15th Judicial Circuit of Florida, in and for Palm Beach County, Probate/ Guardianship Division "IY", before Judge Martin H. Colin, Case No. 502009CP003879XXXXSB | Trial |
| 06/04/12 | Michael Lehmann v. Brittany Rhodes, Superior Court of Forsyth County, GA, before Chief Judge Jeffrey S. Bagley, Case No. 10-CV-1777 | Hearing |
| 08/28/12 | U.S. v. Thanh Quoc Hoang, U.S. Federal District Court, Middle District of Georgia, Macon Div., before Judge C. Ashley Royal, Case Number 5:11-CR-38-CAR | Trial |

**Testimonies of Farrell C. Shiver**
**Page 2 of 3**

| | | |
|---|---|---|
| 10/02/12 | Estate of Lawrence Polek, Probate Court of Gwinnett County, GA, before Probate Judge Walter J. Clarke, Estate 12-E00090 | Hearing |
| 10/25/12 | Sandra Arismendi v. Andres Rubio, Superior Court of DeKalb County, GA, before Judge Asha F. Jackson, Case No. 03-CV-10322-2 | Hearing |
| 11/08/12 | The Estate of Sylvia Joanne Southern by Randal Kevin Reid, Executor v. Brandon Southern, Jr., Superior Court Of Fulton County, GA, before Judge T. Jackson Bedford, Case No. 211CV208241 | Trial |
| 01/24/13 | In the Matter of Niove Rodriquez, Immigration Court, Executive Office of Immigration Review, U.S. Department of Justice, before Judge J. Dan Pelletier, Sr., Case number A200-276-273 | Hearing |
| 03/08/13 | Raymond F. Schinazi, as Trustee of the Rebecca Elizabeth Schinazi 2006 Irrevocable Trust v. Rebecca Elizabeth Schinazi Williams, Superior Court of Fulton County, GA, Civil Action File No. 2012CV213123 | Deposition |
| 04/05/13 | U.S. v. Michael Scripps, U.S. Federal District Court, Eastern District of Pennsylvania at Philadelphia, PA, before Judge Legrome D. Davis, Case No. 2:12-CR-00298 | Trial |
| 04/15/13 | Joseph Sullivan, as personal representative of the Estate of Sammy Sullivan v. Nadal Pediatrics, P.A., Circuit Court for the 13th Judicial Circuit in and for Hillsborough County, FL, before Judge Bernard C. Silver, Civil Action File No. 06 006655 | Trial |
| 05/14/13 | Darrell Brantley v. The Estate of Michael H. Jones, Superior Court of Jasper County, GA, before Judge William A. Prior, Jr., Civil Action File No. 11CV07-288 | Trial |
| 06/11/13 | Yellowbook Sales & Distribution Co. v. John Buffa and Arctic Polar Heating  & Air, LLC, State Court of Fulton County, GA, before Judge Myra H. Dixon, Civil Action File No. 11VS189152 | Trial |
| 12/09/13 | Federal Deposit Insurance Corporation (FDIC), as | Trial |

**Testimonies of Farrell C. Shiver**
**Page 3 of 3**

| | | |
|---|---|---|
| | receiver for Silverton Bank, N.A., Atlanta, Georgia vs. Stanley E. Stephens, Mary D. Stephens, Julie C. Stephens a/k/a Julie Champagne Buck, and Jacob E. Stephens, United States District Court for the Northern District of Georgia, Atlanta Division, before Judge Thomas C. Batten, Sr., Civil Action Number 1:12-cv-03501-TCB | |
| 01/14/14 | YellowBook, Inc. v. Joel & Associates and David Charles Joel, State Court of Fulton County, GA, before Judge Jane Morrison, Civil Action File No. 11EV013670 | Trial |
| 02/3/14 | Albert M. Wade III v. Genworth Financial, Jack Patricia Lehner, Circuit Court of the Tenth Judicial Circuit, Jefferson County, AL, before Judge Jim Hughey III, Civil Action No. CV-2012-904108.00 | Trial |
| 02/06/14 | State of Georgia v. Stanley Chastain, Superior Court of Paulding Co., GA, before Judge James R. Osborne, Case No. 13-CR-1430 | Trial |
| 02/20/14 | Shahn Battle v. Robyn Akin, Superior Court of Douglas Co., GA, before Judge William H. McClain, Civil Action No. 12CV1465 | Hearing |
| 04/24/14 | Edward D. Jones & Co., L.P., William J. Armstrong v. William J. Armstrong and Cynthia Mitchell, Superior Court of Cobb Co., GA, before Judge A. Gregory Poole, Civil Action File No.: 12-1-00306-52 | Trial |
| 06/04/14 | Larelda E. Shark v. Credit Acceptance Corporation, Atlanta, GA, American Arbitration Association, AAA Case No. 30-434-E-000045-14 | Arbitration Hearing |
| 08/11/14 | David Joseph Raczynski v. Meredith Elisabeth Raczynski, Superior Court of Glynn Co., GA, before Judge Roger B. Lane, Civil Action File No. CE12-00762-063 | Hearing |

Exhibit C

# Shiver & Nelson
## Document Investigation Laboratory, Inc.

1903 Lilac Ridge Drive
Woodstock, GA 30189
770-517-6008
Fax: 678-494-9283

## FEE SCHEDULE

**Minimum Fee:** A minimum $1,000.00 non-refundable fee is required. The fee allows for up to five hours of work on the matter for which services are required. For large cases, or cases involving travel away from the laboratory, a higher minimum fee may be required. Although the fee is nonrefundable, unexpended funds will be held on account and can be used for future services on the same case, e.g., testimony.

**Hourly Rate/Expenses:** Work in excess of that covered by the minimum fee is charged at the rate of $200.00 per hour. The hourly rate applies to examinations, report preparation, research, trial preparation, testimony, preparation of trial exhibits, depositions, reading deposition transcripts, travel, consultations, discussions, and any other action where time is expended for the required matter. Work is charged in quarter hour increments. Expenses may be charged in addition to the hourly rate. Examples of expenses are materials, couriers, shipping, and parking fees.

**Travel:** Travel to and from court, depositions, examinations, and meetings are charged at the hourly rate. When travel outside of the office is required, an estimated fee for services to be performed, as well as lodging expenses, per diem, air fares, and rental car (if required), must be prepaid by the client. The client is also responsible for payment of fees for work hours and expenses in excess of the prepaid amount.

**Court Testimony/Depositions:** An advance payment of $1600.00 per day is required for court appearances. If the amount of fees earned is more than the prepaid estimate, the client is responsible for payment of the difference. If the amount of fees earned is less than the prepaid estimate, the client will be refunded the difference, except that a minimum charge of $800.00 for court appearances applies regardless of whether testimony actually occurs. There is a $400.00 per day standby charge to remain in the office on call for testimony (waived if called to testify).

There is a minimum charge of $800.00 for deposition appearances, regardless of whether testimony actually occurs. An estimated fee for services to be performed must be prepaid. Time expended in excess of the minimum and time expended preparing documents requested by the deposing party will be charged at the hourly rate. Unless other arrangements are made, the party requiring the deposition will be responsible for paying the fees related to depositions.

**Out-of-Laboratory Examinations:** There is a $300.00 surcharge for out-of-laboratory examinations involving microscopy, digital imaging, infrared ink examinations, and/or the electrostatic detection of indented writing images.

**Additional Information:** Checks should be made payable to Shiver & Nelson.

Tax Identification Number: 58-2500404                                   Jan. 1, 2014

Exhibit D



**Designation: E 2290 – 07a**

# Standard Guide for
# Examination of Handwritten Items[1]

This standard is issued under the fixed designation E 2290; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This guide provides procedures that should be used by forensic document examiners (E 444) for examinations and comparisons involving handwritten items and related procedures.

1.2 These procedures are applicable whether the examination and comparison is of questioned and known items or of exclusively questioned items.

1.3 These procedures include evaluation of the sufficiency of the material (questioned, or known, or both) available for examination.

1.4 The particular methods employed in a given case will depend upon the nature of the material available for examination.

1.5 This guide may not cover all aspects of unusual or uncommon examinations of handwritten items.

1.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory requirements prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:* [2]
E 444 Guide for Scope of Work of Forensic Document Examiners
E 1658 Terminology for Expressing Conclusions of Forensic Document Examiners
E 1732 Terminology Relating to Forensic Science

E 2195 Terminology Relating to the Examination of Questioned Documents

## 3. Terminology

3.1 For definitions of terms in this guide, refer to Terminologies E 1732 and E 2195.

3.2 *Definitions:*

3.2.1 *known, n/adj*——of established origin associated with the matter under investigation.                                 **E 1732**

3.2.2 *questioned, n/adj*——associated with the matter under investigation about which there is some question, including, but not limited to, whether the questioned and known items have a common origin.                                       **E 1732**

3.3 *Definitions of Terms Specific to This Standard:*

3.3.1 *absent character, n*—a character or character combination which is present in one body of writing but is not present (for example, does not have a corresponding character) in another body of writing.

3.3.2 *character, n*—any language symbol (for example, letter, numeral, punctuation mark, or other sign), other symbol, or ornament.

3.3.3 *characteristic, n*—a feature, quality, attribute, or property of writing.

3.3.4 *comparable, n/adj*——pertaining to handwritten items that contain the same type(s) of writing and similar characters, words, and combinations. Contemporaneousness and writing instruments may also be factors.

3.3.5 *distorted writing, n*—writing that does not appear to be, but may be natural. This appearance can be due to either voluntary factors (for example, disguise, simulation) or involuntary factors (for example, physical condition of the writer, writing conditions).

3.3.6 *handwritten item, n*—an item bearing something written by hand (for example, cursive writing, hand printing, signatures).

NOTE 1—As used in this standard "handwriting" and "handwritten" are generic terms. Writing is generally, but not invariably, produced using the hand, and may be the result of some other form of direct manipulation of a writing or marking instrument by an individual.

---

[1] This guide is under the jurisdiction of ASTM Committee E30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents.
Current edition approved April 15, 2007. Published July 2007. Originally approved in 2003. Last previous edition approved in 2007 as E 2290 – 07.
[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

Copyright by ASTM Int'l (all rights reserved); Tue Feb 12 15:01:06 EST 2008
Downloaded/printed by

E 2290 – 07a

3.3.7 *individualizing characteristics*, *n*—marks or properties that serve to uniquely characterize writing.

3.3.7.1 *Discussion*—Both class characteristics (marks or properties that associate individuals as members of a group) and individual characteristics (marks or properties that differentiate the individual members in a group) are individualizing characteristics.

3.3.8 *item*, *n*—an object or quantity of material on which a set of observations can be made.

3.3.9 *natural writing*, *n*—any specimen of writing executed without an attempt to control or alter its usual quality of execution.

3.3.10 *range of variation*, *n*—the accumulation of deviations among repetitions of respective handwriting characteristics that are demonstrated in the writing habits of an individual. (See *variation*, 3.3.15).

3.3.11 *significant difference*, *n*—an individualizing characteristic that is structurally divergent between handwritten items, that is outside the range of variation of the writer, and that cannot be reasonably explained.

3.3.12 *significant similarity*, *n*—an individualizing characteristic in common between two or more handwritten items.

3.3.13 *sufficient quantity*, *n*—that amount of writing required to assess the writer's range of variation, based on the writing examined.

3.3.14 *type of writing*, *n*—refers to hand printing, cursive writing, numerals, symbols, or combinations thereof, and signatures.

3.3.15 *variation*, *n*—those deviations among repetitions of the same handwriting characteristic(s) that are normally demonstrated in the habits of each writer.

3.3.15.1 *Discussion*—Since variation is an integral part of natural writing, no two writings of the same material by the same writer are identical in every detail. Within a writer's range of variation, there are handwriting habits and patterns that are repetitive and similar in nature. These repetitive features give handwriting a distinctive individuality for examination purposes. Variation can be influenced by internal factors such as illness, medication, intentional distortion, etc. and external factors such as writing conditions and writing instrument, etc.

## 4. Significance and Use

4.1 The procedures outlined here are grounded in the generally accepted body of knowledge and experience in the field of forensic document examination. By following these procedures, a forensic document examiner can reliably reach an opinion concerning whether two or more handwritten items were written by the same person(s).

NOTE 2—The phrase "written by the same person(s)" refers to physical generation of the writing, not to intellectual ownership of the content.

## 5. Interferences

5.1 Items submitted for examination may have inherent limitations that can interfere with the procedures in this Guide. Limitations should be noted and recorded.

5.2 Limitations can be due to submission of non-original documents, limited quantity or comparability, or condition of the items submitted for examination. Other limitations can come from the quantity or comparability of the writing submitted, and include absent characters, dissimilarities, or limited individualizing characteristics. Such features are taken into account in this guide.

5.3 The results of prior storage, handling, testing, or chemical processing (for example, for latent prints) may interfere with the ability of the examiner to see certain characteristics. Whenever possible, document examinations should be conducted prior to any chemical processing. Items should be handled appropriately to avoid compromising subsequent examinations (for example, with clean cloth gloves).

5.4 Consideration should be given to the possibility that various forms of simulations, imitations, and duplications of handwriting can be generated by computer and other means.

## 6. Equipment and Requirements

6.1 Appropriate light source(s) of sufficient intensity to allow fine detail to be distinguished.

NOTE 3—Natural light, incandescent or fluorescent sources, or fiber optic lighting systems are generally utilized. Transmitted lighting, side lighting, and vertical incident lighting have been found useful in a variety of situations.

6.2 Magnification sufficient to allow fine detail to be distinguished.

6.3 Other apparatus as appropriate.

6.4 Imaging or other equipment for recording observations as required.

6.5 Sufficient time and facilities to complete all applicable procedures.

## 7. Procedure

7.1 All procedures shall be performed when applicable and noted when appropriate. These procedures need not be performed in the order given.

7.2 Examinations, relevant observations, and results shall be documented.

7.3 At various points in these procedures, a determination that a particular feature is not present or that an item is lacking in quality or comparability may indicate that the examiner should discontinue or limit the procedure(s). It is at the discretion of the examiner to discontinue the procedure at that point and report accordingly or to continue with the applicable procedures to the extent possible. The reasons for such a decision shall be documented.

7.4 Determine whether the examination is a comparison of questioned writing to known writing or a comparison of questioned writing to questioned writing.

7.5 Determine whether the questioned writing is original writing. If it is not original writing, request the original.

NOTE 4—Examination of the original questioned writing is preferable.

7.5.1 If the original is not submitted, evaluate the quality of the best available reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for comparison purposes and proceed to the extent possible. If the writing has not been reproduced with sufficient clarity for comparison purposes, discontinue these procedures and report accordingly.

2

Copyright by ASTM Int'l (all rights reserved); Tue Feb 12 15:01:06 EST 2008
Downloaded/printed by

E 2290 – 07a

7.6 Determine whether the questioned writing appears to be distorted. If it appears to be distorted, determine whether it is possible to establish that the apparently distorted writing is natural writing.

7.6.1 If it is not natural writing, or if it is not possible to establish whether the apparently distorted writing is natural writing, determine whether the apparently distorted writing is suitable for comparison and proceed to the extent possible. If the available questioned writing is not suitable for comparison, discontinue these procedures and report accordingly.

7.7 Evaluate the questioned writing for the following:

7.7.1 *Type of Writing*—If there is more than one type of writing within the questioned writing, separate the questioned writing into groups of single types of writing.

7.7.2 *Internal Consistency*—If there are inconsistencies within any one of the groups created in 7.7.1 (for example, suggestive of multiple writers), divide the group(s) into sub-groups, each one of which is consistent.

7.7.3 Determine range of variation of the writing for each group or sub-group of the questioned writing created in 7.7.1 and 7.7.2.

7.7.4 Determine presence or absence of individualizing characteristics.

7.7.5 If the examination is a comparison of exclusively questioned writing, go to 7.12.

7.8 Determine whether the known writing is original writing. If it is not original writing, request the original.

NOTE 5—Examination of the original known writing is preferable.

7.8.1 If the original is not submitted, evaluate the quality of the best available reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for comparison purposes and proceed to the extent possible. If the writing has not been reproduced with sufficient clarity for comparison purposes, discontinue these procedures and report accordingly.

7.9 Determine whether the known writing appears to be distorted. If it appears to be distorted, determine whether it is possible to establish that the apparently distorted writing is natural writing.

7.9.1 If it is not natural writing, or if it is not possible to establish whether the apparently distorted writing is natural writing, determine whether the apparently distorted writing is suitable for comparison and proceed to the extent possible. It should be determined whether additional known writing would be of assistance, and if so, it should be requested. If the available known writing is not suitable for comparison, discontinue these procedures and report accordingly.

7.10 Evaluate the known writing for the following:

7.10.1 *Type of Writing*—If there is more than one type of writing within the known writing, separate the known writing into groups of single types of writing.

7.10.2 *Internal Consistency*—If there are unresolved inconsistencies within any of the groups created in 7.10.1 (for example, suggestive of multiple writers), contact the submitter for authentication. If any inconsistencies are not resolved to the examiner's satisfaction, discontinue these procedures for the affected group(s), and report accordingly.

7.10.3 Determine range of variation of the writing for each group of the known writing created in 7.10.1 and 7.10.2.

7.10.4 Determine presence or absence of individualizing characteristics.

7.11 Evaluate the comparability of the bodies of writing (questioned writing to known writing or exclusively questioned writing).

7.11.1 If the bodies of writing are not comparable, discontinue comparison and request comparable known writing, if appropriate.

7.11.1.1 If comparable known writing is made available, return to 7.10. If comparable known writing is not made available, discontinue these procedures and report accordingly.

7.12 Conduct a side-by-side comparison of comparable portions of the bodies of writing.

7.12.1 Determine whether there are differences, absent characters, and similarities.

7.12.2 Evaluate their significance individually and in combination.

7.12.3 Determine if there is a sufficient quantity of writing (questioned writing, or known writing, or both).

7.12.3.1 If writing (questioned writing, or known writing, or both) is not sufficient in quantity for an elimination or an identification, continue the comparison to the extent possible. When appropriate, request more known writing. If more known writing is made available, return to 7.10.

7.12.4 Analyze, compare, and evaluate the individualizing characteristics and other potentially significant features present in the comparable portions of the bodies of writing.

NOTE 6—Among the features to be considered are elements of the writing such as abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation.

Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and guide lines of various forms should be evaluated when present.

Potential limiting factors such as age; illness or injury; medication, drugs or alcohol (intoxication or withdrawal); awkward writing position; cold or heat; fatigue; haste or carelessness; nervousness; nature of the document, use of the unaccustomed hand; deliberate attempt at disguise or auto-forgery should be considered.

For further details, see the referenced texts.

7.12.5 Evaluate the similarities, differences, and limitations. Determine their significance individually and in combination.

7.13 Form a conclusion based on results of the above analyses, comparisons, and evaluations.

## 8. Reporting Conclusions

8.1 The conclusion(s) or opinion(s) resulting from the procedures in this guide may be reached once sufficient examinations have been conducted. The number and nature of the necessary examinations is dependent on the question at hand.

3

Copyright by ASTM Int'l (all rights reserved); Tue Feb 12 15:01:06 EST 2008
Downloaded/printed by

**E 2290 – 07a**

8.2 The bases and reasons for the conclusion(s), opinion(s), should be included in the examiner's documentation and may appear in the report.

8.3 Refer to Terminology E 1658 for reporting conclusion(s) or opinion(s).

## 9. Keywords

9.1 forensic sciences; handwriting; questioned documents

## REFERENCES

(1) Conway, J. V. P., *Evidential Documents*, Springfield, IL, Charles C. Thomas, 1959.

(2) Harrison, W. R., *Suspect Documents*, London, Sweet and Maxwell, 1958 and 1966.

(3) Hilton, O., *Scientific Examination of Questioned Documents*, New York, Elsevier, 1982.

(4) Huber, R. A. and Headrick, A. M., *Handwriting Identification: Facts and Fundamentals*, Boca Raton, FL, CRC Press, 1999.

(5) Osborn, A. S., *Questioned Documents*, 2d ed., Albany, NY, Boyd Printing Co., 1929.

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).

Copyright by ASTM Int'l (all rights reserved); Tue Feb 12 15:01:06 EST 2008
Downloaded/printed by

Exhibit E

 **Designation: E 1658 − 08**

# Standard Terminology for Expressing Conclusions of Forensic Document Examiners[1]

This standard is issued under the fixed designation E 1658; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This terminology is intended to assist forensic document examiners in expressing conclusions or opinions based on their examinations.

1.2 The terms in this terminology are based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science that was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners[2].

## 2. Referenced Documents

2.1 *ASTM Standards:*[3]
E 444 Guide for Scope of Work of Forensic Document Examiners

## 3. Significance and Use

3.1 Document examiners begin examinations from a point of neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.

3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. The expressions used to differentiate the gradations of opinions should not be considered as strongly defined "categories". These expressions should be guidelines without sharply defined boundaries.

3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.

3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, *i. e.,* to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.

3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in Guide E 444, and it may be used by forensic examiners in other areas, as appropriate.

3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 4. Terminology

4.1 *Recommended Terms:*

**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.
*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.

**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order;

[1] This terminology is under the jurisdiction of ASTM Committee E30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents.

Current edition approved Aug. 15, 2008. Published October 2008. Originally approved in 1995. Last previous edition approved in 2004 as E 1658 – 04.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

[3] McAlexander T. V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science,* Vol. 36. No. 2, March 1991, pp. 311–319.

Copyright C ASTM International, 100 Barr Harbor Dr., P.O. box C-700 West Conshohocken, Pennsylvania 19428-2959, United States

Copyright by ASTM Int'l (all rights reserved); Mon Jan 25 23:59:46 EST 2010
Downloaded/printed by

E 1658 – 08

however, the examiner is virtually certain that the questioned and known writings were written by the same individual.

*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.

DISCUSSION—Some examiners doubt the desirability of differentiating between **strong probability** and **probable**, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**probable**—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the" virtually certain" degree of confidence.

*Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

**indications (evidence to suggest)**—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.

*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.

DISCUSSION—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**no conclusion (totally inconclusive, indeterminable)**—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another.

*Examples*—*No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

**indications did not**—this carries the same weight as the indications term; that is, it is a very weak opinion.

*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence *suggests* that the John Doe of the

known material did not write the questioned material, or I found *indications* that the John Doe of the known material did *not* write the questioned material but the evidence is far from conclusive.

See Discussion after **indications**.

**probably did not**—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.

*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.

DISCUSSION—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

**strong probability did not**—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.

*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

DISCUSSION—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

**elimination**—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.

*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

DISCUSSION—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1 When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

4.2 *Deprecated and Discouraged Expressions*:

2

Copyright by ASTM Int'l (all rights reserved); Mon Jan 25 23:59:46 EST 2010
Downloaded/printed by

∰ E 1658 – 08

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion*. To say that the suspect "could have written the material in question" says nothing about probability and is therefore meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

**consistent with**—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

**could not be identified/cannot identify**—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

**similarities were noted/differences as well as similarities**—these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

**cannot be associated/cannot be connected**—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

**no identification**—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing; to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as." I no identified the writer" or "I made a no ident in this case."

**inconclusive**—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

**positive identification**—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

**[strong] reason to believe**—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

**qualified identification**—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination*.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

Copyright by ASTM Int'l (all rights reserved); Mon Jan 25 23:59:46 EST 2010
Downloaded/printed by

Exhibit F