0624 005 12:48 116

## PART TWO
## LIFE INSURANCE APPLICATION



Travelers Life & Annuity
A Member of citigroup

### GENERAL INSTRUCTIONS TO THE MEDICAL EXAMINER

THE EXAMINATION MUST BE MADE IN PRIVATE; AGENT MUST NOT BE PRESENT

■ All questions are to be completed by the medical examiner.
■ The "Part Two" below becomes a part of the contract of insurance and, therefore, completion of all sections and the signature of the Proposed Insured with signature of witness is necessary.

REQUESTER'S NAME (print full name) _MAx Hilsman / Aim System_
REQUESTER'S PHONE NUMBER _678-297-0700_

### POLICY RISK INFORMATION - MEDICAL HISTORY

PROPOSED INSURED (Print name in full) _IGNATIUS AKPELE_     Date of Birth (Mo./Day/Yr.) _3-17-46_     Birthplace _NIGERIA_     Social Security No.

Name and address of personal physician (If none so state) _777 Cleveland AV Ste 305 Atlanta GA 30315_   _STANTON SPENCE MD_
Date and reason last consulted _yearly ckup-2004_
What diagnosis was made? What treatment was given or medication prescribed? Are any follow-up tests planned? _vme_

1. Has the Proposed Insured ever had any indication of, been treated for or received medical consultation for:

|  | YES | NO |
|---|---|---|
| a. Disorder of eyes, ears, nose or throat? | ☐ | ☑ |
| b. Seizures, convulsions, stroke, paralysis, fainting, dizziness, frequent headaches, or disorder of the brain, nerves or nervous system? | ☐ | ☑ |
| c. Nervous or emotional disorder, depression, anxiety or attempted suicide? | ☐ | ☑ |
| d. Heart disease, chest pain, heart attack, heart murmur, high blood pressure, rheumatic fever, palpitation, irregular heart beat, peripheral vascular disease or other disorder of the heart or blood vessels? | ☐ | ☑ |
| e. Asthma, pneumonia, emphysema, infection, shortness of breath, persistent hoarseness or cough, bloodspitting, bronchitis, pleurisy, tuberculosis or other disorder of respiratory system? | ☐ | ☑ |
| f. Jaundice, intestinal bleeding, colitis, diverticulitis, pancreatitis, hepatitis, ulcer or other disorder of esophagus, stomach, duodenum, intestines, rectum, gallbladder, liver, spleen or pancreas? | ☐ | ☑ |
| g. Disorder of the kidneys, bladder, prostate, breasts, reproductive organs or sexually transmitted disease or history of protein, sugar, blood or pus in urine? | ☐ | ☑ |
| h. Diabetes, thyroid, elevated cholesterol or other endocrine disorders? | ☑ | ☐ |
| i. Any disease or disorder of back, neck, spine, bones, ligaments, muscles, tendons or joints, arthritis, neuritis, rheumatism, gout, disc disorders, deformity or amputation? | ☐ | ☑ |
| j. Cancer, tumors, cysts, abnormality of skin or disorder of lymph glands? | ☑ | ☐ |
| k. Allergies, anemia or other disorder of the blood? | ☑ | ☐ |
| l. Had any weight changes in the past year? | ☑ | ☐ |

For "YES" responses: identify question # and circle applicable items. Include diagnoses, treatments, dates, duration of illness or injury, if recovery was full and complete, and names/addresses of all attending physicians/medical facilities.

**Smith Barney NB**

**MAY 19 2005**

The Travelers Insurance Company
The Travelers Life and Annuity Company
P.O. Box 990018 Hartford, Connecticut 06199-0018

-17403-18

Q1(1)

## POLICY RISK INFORMATION - MEDICAL HISTORY (CON'T)

PROPOSED INSURED *(Print name in full):* _____

| | YES | NO |
|---|---|---|
| 2. Within the past 10 years, has the Proposed Insured ever been diagnosed or received treatment for Acquired Immune Deficiency Syndrome (AIDS), or had a positive test for infection by the AIDS (HIV) virus? | ☐ | ☒ |

3. Other than the above, has the Proposed Insured:

| | YES | NO |
|---|---|---|
| a. Ever had any mental or physical disorder or illness, injury, surgery, or been a patient in a hospital or other medical facility? | ☐ | ☒ |
| b. Within the past 5 years, had any physical exam, consultation, EKG, x-ray or other medical test? | ☒ | ☐ |
| c. Been advised to seek medical attention, have surgery or have other medical tests done which have not been performed? | ☐ | ☒ |

*3b. yearly exam Dr. Spence.*

4. Has the Proposed Insured:

| | YES | NO |
|---|---|---|
| a. Ever used cocaine, marijuana, heroin or any other illicit drug or been advised to restrict the use of alcohol or any other drug? | ☐ | ☒ |
| b. Ever received medical treatment, been counseled for or joined an organization which has as its purpose the curing or controlling of alcohol or drug abuse? | ☐ | ☒ |

5. Has the Proposed Insured during the past year:

| | YES | NO |
|---|---|---|
| a. Taken prescription medication? | ☐ | ☒ |
| b. Taken non-prescription medications, including herbal, supplements or other alternative therapies/regimens? | ☐ | ☒ |

6. Proposed Insured's use of tobacco/nicotine products including (but not limited to) cigarettes, cigars, pipes or any smoking materials, snuff, chewing tobacco, nicotine gum, or nicotine patch is as indicated below:

☐ Currently uses tobacco/nicotine ☒ Has never used tobacco/nicotine products of any form.
☐ Has not used tobacco/nicotine products of any form in the past _____ months/_____ years.

| | YES | NO |
|---|---|---|
| 7. Does the Proposed Insured consume alcoholic beverages? (If "YES", list type, amount and frequency) | ☐ | ☒ |
| 8. Has a parent, brother or sister ever had heart disease, stroke/cerebrovascular disease, cancer or kidney disease? | ☐ | ☒ |

9.

| FAMILY HISTORY | Age (if Living) | Condition of Health | Age (at Death) | Cause of Death |
|---|---|---|---|---|
| Father | No | | 72 | Natural |
| Mother | Yes | Yes Good | 83 | |
| Brothers and Sisters | Yes | Good | 52 | |
| | Yes | Good | 50 | |

It is agreed that all statements and answers given on the Part Two Application are complete and true to the best of my knowledge and belief and shall constitute a part of this application.

_____  _____  5/4/05
Proposed Insured (Signature in full)                              Dated

_____  Atlanta, GA
Witnessed By                  City, State Where Witnessed

L-17403-18                    2                    Q1(2)

MAY-18-05   12:30   FROM-AIM Systems, Inc        8782872668        T-636   P 004/054   F-417

**Agent- Indicate Company:** ☐ The Travelers Insurance Company   ☐ The Travelers Life and Annuity Company
In this application, "Company" refers to the insurance company whose name is checked above.

**CLIENT INFORMATION**

*Questions must be answered by Proposed Insured and Additional Proposed Insured, if applicable.*
*If under age 16, complete Juvenile Supplement.*

**PROPOSED INSURED:**

1. Full Name *(print as to appear in policy)* _Ignatius_ _E_ _Akpele_
   First                    Middle            Last

2. Social Security No. _7654_   Date of Birth _3/17/46_   Birthplace _Nigeria_
                                                                     State, Country (if other than U.S.)
   Sex ☑M ☐F  Marital Status: ☐S ☑M ☐D ☐W   Current Citizen of _USA_
                                                                Country
   Visa Type or Green Card No. and date issued: _____

3. Residence Address _5070 Falcon Chase LN NE_   Apt. No. _____
                        Street and number
   City _Atlanta_   State _GA_   Zip _21281_  Phone Number _404 466-3419_
                                    _30342_
   Email Address _____   Driver's License No. and State _035870061_

4. If Proposed Insured has resided at address less than one year, show prior address: _____

5. Employer (Name of Firm) _AIE Surgy Product_   Occupation (Position or Title) _Senior Dataphysel_

6. Business Address _285 Boulevard NE, Suite 505_
                       Street and number
   City _Atlanta_   State _GA_   Zip _30342_  Phone Number _626 904-4825_
   Check Calling Preference: ☑ Home  ☐ Business   Best time to call _____

7. Annual Salary $ _1,000,000.—_   Other Income $ _____   Net Worth $ _5,000,000.—_

**ADDITIONAL PROPOSED INSURED (IF APPLICABLE):**

1. Full Name *(print as to appear in policy)* _____
                                           First      Middle      Last

2. Social Security No. _____   Date of Birth _____   Birthplace _____
                                                                     State, Country (if other than U.S.)
   Sex ☐M ☐F - Marital Status: ☐S ☐M ☐D ☐W   Current Citizen of _____
                                                                Country
   Visa Type or Green Card No. and date issued: _____

3. Residence Address _____   Apt. No. _____
                        Street and number
   City _____   State _____   Zip _____  Phone Number (___) _____
   Email Address _____   Driver's License No. and State _____

4. If Proposed Insured has resided at address less than one year, show prior address: _____

5. Employer (Name of Firm) _____   Occupation (Position or Title) _____

6. Business Address _____
                       Street and number
   City _____   State _____   Zip _____  Phone Number (___) _____
   Check Calling Preference: ☐ Home  ☐ Business  Best time to call _____

7. Annual Salary $ _____   Other Income $ _____   Net Worth $ _____

The Travelers Insurance Company
The Travelers Life and Annuity Company
P.O. Box 990018, Hartford, Connecticut 06199-0018

L-17400-10                        Page 2

Q1 (3)

MAY-18-05   12:30   FROM-AIM Systems, Inc.                    6782872666        T-636   P.005/054   F-417

8. List all life insurance policies or annuity contracts now in effect on any Proposed Insured. If "None," so state. If any life insurance or annuity in this Company or any other company will be replaced, discontinued, reduced or changed if insurance now applied for is issued, so indicate and provide the policy number.

| Insured's Name | Company | year issued | Face Amount | Personal or Business ? | Will be Replaced? | If Yes, Policy # | 1035 Exch.? |
|---|---|---|---|---|---|---|---|
| *None* | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**POLICY INFORMATION**

9. Product __PERSON'S WHOLE LIFE__   Stated Amount $ ___5,148,206___
   (For variable life, also complete Variable Life Supplement)   (If $1 million or above, also complete Life Financial Supplement)

   Term Period _____   Death Benefit (UL/VUL Only): ☒ Level ☐ Increasing/Variable

10. Supplemental Benefits/Riders *(where applicable and if available):*

**Term and Whole Life Rider:**
☐ Premium Waiver

**Term, UL and VUL Riders:**
☐ Child Term _____ units
   *(Requires completion of Family Insurance Supplement)*
☐ _____

**UL- and VUL- only Riders:**
☐ Accelerated Benefits
☐ Accidental Death $ _____
☐ Annual Renewable Term $ _____
☐ COLA
☐ Death Benefit Guarantee (UL)
☐ Estate Protector
☐ Estate Tax Repeal

☐ Insured Term $ _____
☒ Lapse Protection Guarantee (VUL)
☐ Monthly Deduction Waiver
☐ Policy Split Option   ☐ Plus Option
☐ Return of Premium
☐ Scheduled Increase Option _____ %
☐ Specified Amount Payment/Waiver $ _____
☐ Spousal Term $ _____

11. Premium Payment Plan (check 1): ☐ Single ☐ Annual ☐ Semi-Annual ☐ Monthly Pre-Authorized Collection/Payor Soc. Sec. No. _____

   Premium Payor: __Dr Ignatius E. Akpele__ Billing Address: __285 Boulevard NE__
   __Suite 525 Atlanta GA 30312__

12. Quoted Modal Premium $ __225K__

13. What rate class is being applied for on Proposed Insured? __STANDARD__ On Additional Proposed Insured? _____

14. If rate class applied for is not available, would a higher rate on any Proposed Insured be acceptable? ☒ YES ☐ NO

15. Will this application increase an existing policy? ☐ YES ☒ NO   If "YES," Policy # _____
   Current Stated Amount $ _____   New Stated Amount $ _____
   Current Modal Premium $ _____   New Modal Premium $ _____

**CONSUMER NOTICE**

We may provide information about you or your policy or account, including information from this application, for marketing and administrative purposes and share such information with our corporate affiliates. You agree that any such information may be used by us or an affiliate to determine whether you qualify for or to offer other Citigroup, Inc. financial services.

☒ If checked, you have indicated that you do not wish to have any such information shared with our affiliate(s).

L-17400-10                          Page 3                          Q1 (4)

MAY-18-05   12:31   FROM-AIM Systems, Inc                    6782972666           T-638   P 006/054   F-417

**POLICY OWNER**

*Applicant is the owner unless otherwise noted below.*
*For Multiple Ownership: Upon owner's death, indicate whether ownership interests pass to:*
☐ Surviving Owner(s) (Joint Tenants) or ☐ Deceased Owner's Estate (Tenants In Common)

16. Policy Owner's Full Name (If a Trust, provide Trustee Name(s), Trust Name, Date of Trust and State in which Trust is established.)

DR IGNATIUS E. AKPELE DB PLAN
DR IGNATIUS E. AKPELE - TRUSTEE   EST 4/27/05 GA

Owner's Social Security or Tax ID Number(s)
Owner's Address:   5070 FALCON CHASE LANE
ATLANTA GA 30342

**TRUSTEE CERTIFICATION**

CERTIFICATION OF TRUSTEE(S): Each of the undersigned trustees individually certifies that: (a) all of the above information is true and may be relied on by the Company; (b) they have the right to own and purchase life insurance on the life of the Proposed Insured(s) under the terms of the Trust and applicable law; (c) by completing this certification and acknowledgement and the life insurance application, they have the power to bind the Trust to purchase the policy; (d) the Trust is in full force and effect as of the date of the application; (e) under the terms of the Trust and applicable law, the trustees have the authority to exercise all rights and powers under the policy without the consent of the Proposed Insured(s), including but not limited to, purchasing of insurance, naming and changing beneficiaries, paying premiums, surrendering the policy, withdrawing cash value, borrowing cash value, and assigning or transferring the policy or its proceeds; and (f) the purchase and ownership of the policy by the Trust is being made upon the advice of legal counsel familiar with the objectives of the Trust, the Proposed Insured(s), the Grantor(s) and the Beneficiary(ies). Payment by the Company of policy proceeds to the trustees shall constitute satisfaction of the Company's obligation under the policy to the extent of such payment.

Signature of Trustees                                                        Date Signed
_Ignat____ _Akpere_____                                                     4/27/05
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

**BENEFICIARY**

*Payment due to two or more beneficiaries or to the survivor(s) of them will be in equal shares, unless otherwise requested. The right to change a beneficiary is reserved.*

17. Beneficiary Name (specify full name(s), relationship(s) and Social Security No.(s))
UZO AKPELE                                                 055
JOHN CHIMASOLE AKPELE                                      7722

**GENERAL RISK INFORMATION**

*Please give details to all "YES" answers in the ADDITIONAL INFORMATION section on next page.*

|  | Proposed Insured: | | Additional Proposed Insured: | |
|---|---|---|---|---|
| Has any Proposed Insured: | Yes | No | Yes | No |
| 18. Been postponed, rated or declined for Life, Health, Accident or Sickness Insurance in the past 5 years? (If "YES," state reason(s) and date(s) of such action.) | ☐ | ☑ | ☐ | ☐ |
| 19. Flown within 5 years as a pilot, student pilot or crew member of any aircraft or as a passenger on other than a scheduled airline, or expect to make such a flight? (If "YES," complete the Aviation Supplement.) | ☐ | ☑ | ☐ | ☐ |
| 20. Engaged in automobile or motorcycle racing, parachuting, skydiving/B.A.S.E. jumping, hang gliding, skin or SCUBA diving or any other hazardous sport? (If "YES," complete the Avocation Supplement.) | ☐ | ☑ | ☐ | ☐ |
| 21. A) In the past 5 years, been arrested for or convicted of driving while intoxicated or driving under the influence? | ☐ | ☑ | ☐ | ☐ |
| B) In the past 5 years, been arrested for or convicted of any other motor vehicle violation? | ☐ | ☑ | ☐ | ☐ |
| 22. Had prior arrests/convictions in a criminal proceeding or been the subject of a criminal proceeding? | ☐ | ☑ | ☐ | ☐ |
| 23. Do you intend to reside or travel out of the United States or Canada? (If "YES," complete the Foreign Travel or Residence Supplement.) | ☐ | | ☐ | ☐ |

L-17400-10                                   **Page 4**

Q1(5)

JUN-15-2005 09:16 FROM:               4044593840          TO:8603083943          P.2/4

**POLICY OWNER**

*Applicant is the owner unless otherwise noted below.*
**For Multiple Ownership:** Upon owner's death, indicate whether ownership interests pass to:
☐ Surviving Owner(s) (Joint Tenants) or ☐ Deceased Owner's Estate (Tenants in Common)

16. Policy Owner's Full Name (If a Trust, provide Trust ☐ ✓ Trust and State in which Trust is established.)

DR IGNATIUS E AKPELE   DB PLAN

DR IGNATIUS E A AKPELE                    4/19/05 GA

Owner's Social Security or Tax ID Number   58-259 8468

Owner's Address:   5070 FALCON CHASE LANE

ATLANTA GA 30342

**TRUST CERTIFICATION**

**CERTIFICATION OF TRUSTEE(S):** Each of the undersigned trustees individually certifies that: (a) all of the above information is true and may be relied on by the Company; (b) they have the right to own and purchase life insurance on the life of the Proposed Insured(s) under the terms of the Trust and applicable law; (c) by completing this certification and acknowledgement and the life insurance application, they have the power to bind the Trust to purchase the policy; (d) the Trust is in full force and effect as of the date of the application; (e) under the terms of the Trust and applicable law, the trustees have the authority to exercise all rights and powers under the policy without the consent of the Proposed Insured(s), including but not limited to, purchasing of insurance, naming and changing beneficiaries, paying premiums, surrendering the policy, withdrawing cash value, borrowing cash value, and assigning or transferring the policy or its proceeds; and (f) the purchase and ownership of the policy by the Trust is being made upon the advice of legal counsel familiar with the objectives of the Trust, the Proposed Insured(s), the Grantor(s) and the Beneficiary(ies). Payment by the Company of policy proceeds to the trustees shall constitute satisfaction of the Company's obligation under the policy to the extent of such payment.

Signature of Trustees                                Date Signed

4/27/05

**BENEFICIARY**

*Payment due to two or more beneficiaries or to the survivor(s) of them will be in equal shares, unless otherwise requested. The right to change a beneficiary is reserved.*

17. Beneficiary Name (specify full name(s), relationship(s) and Social Security No.(s))   DR IGNATIUS E. AKPELE DB PLAN
                                                                                          58-259 8468

**GENERAL QUESTIONS**

*Please give details to all "YES" answers in the ADDITIONAL INFORMATION section on next page.*

| Has any Proposed Insured: | Proposed Insured: | | Additional Proposed Insured: | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| 18. Been postponed, rated or declined for Life, Health, Accident or Sickness Insurance in the past 5 years? (If "YES," state reason(s) and date(s) of such action.) | ☐ | ☑ | ☐ | ☐ |
| 19. Flown within 5 years as a pilot, student pilot or crew member of any aircraft or as a passenger on other than a scheduled airline, or expect to make such a flight? (If "YES," complete the Aviation Supplement.) | ☐ | ☑ | ☐ | ☐ |
| 20. Engaged in automobile or motorcycle racing, parachuting, skydiving/B.A.S.E. jumping, hang gliding, skin or SCUBA diving or any other hazardous sport? (If "YES," complete the Avocation Supplement.) | ☐ | ☑ | ☐ | ☐ |
| 21. A) In the past 5 years, been arrested for or convicted of driving while intoxicated or driving under the influence? | ☐ | ☑ | ☐ | ☐ |
| B) In the past 5 years, been arrested for or convicted of any other motor vehicle violation? | ☐ | ☑ | ☐ | ☐ |
| 22. Had prior arrests/convictions in a criminal proceeding or been the subject of a criminal proceeding? | ☐ | ☑ | ☐ | ☐ |
| 23. Do you intend to reside or travel out of the United States or Canada? (If "YES," complete the Foreign Travel or Residence Supplement.) | ☐ | ☑ | ☐ | ☐ |

L-17400-10                                Page 4

QI (6)

MAY-18-05   12:32   FROM-AIM Systems, Inc          6782972666          T-836   P 007/054   F-417

**░░░░░░░░░░░░░░░░░░░░ PROPOSED INSURED INFORMATION ░░░░░░░░░░░░░░░░░░░░**

Proposed Insured: _____

_____

_____

Additional Proposed Insured: _____

**░░░░░░░░░░░░░░░░░░░░░░░ MEDICAL HISTORY ░░░░░░░░░░░░░░░░░░░░░░░**

1.a. Print Proposed Insured's name in full: DR IGNATIUS E. AKPELE

b. Name and address of personal physician: Dr Stanton 777 Cleveland Ave, Atz. GA 30331

c. Date and reason last consulted: 4/04

d. What was the diagnosis and treatment: Alonto - CHECK UP

2.a. Print Additional Proposed Insured's name in full: _____

b. Name and address of personal physician: _____

_____

c. Date and reason last consulted: _____

d. What was the diagnosis and treatment: _____

*Answer all questions unless Part Two (Medical Exam) is required. For all "YES" responses, provide in the "DETAILS" section the question number, names and addresses of doctors, and when and why consulted. Include diagnoses, treatments, dates, duration of illness or injury, and if recovery was full and complete.*

|  | Proposed Insured: Yes No | Additional Proposed Insured: Yes No |
|---|---|---|
| 3.a. Has the Proposed Insured ever had any indication of, been treated or received medical consultation for: *(circle all that apply)* ........ | ☐ ☑ | |
| Chest Pain, Heart Murmur, Heart Attack, High Blood Pressure, Stroke, Paralysis, Seizure, Deformity, Elevated Cholesterol, Diabetes, Emphysema, Pneumonia, Tuberculosis, Asthma, Hepatitis, Tumor, Cancer, Arthritis, Sexually Transmitted Disease, Depression, Anxiety, Emotional Disorder, Alcohol/Drug Abuse | | |
| b. Has the Additional Proposed Insured ever had any indication of, been treated or received medical consultation for: *(circle all that apply)* ........ | | ☐ ☐ |
| Chest Pain, Heart Murmur, Heart Attack, High Blood Pressure, Stroke, Paralysis, Seizure, Deformity, Elevated Cholesterol, Diabetes, Emphysema, Pneumonia, Tuberculosis, Asthma, Hepatitis, Tumor, Cancer, Arthritis, Sexually Transmitted Disease, Depression, Anxiety, Emotional Disorder, Alcohol/Drug Abuse | | |
| 4.a. Has the Proposed Insured ever had any disorder of: *(circle all that apply)* ........ | ☐ ☑ | |
| Skin, Neck, Back, Spine, Bones, Joints, Eyes, Ears, Thyroid, Heart, Cerebrovascular System, Lungs, Breasts, Gastrointestinal System, Liver, Kidney, Genitourinary System, Immune System, Nervous System, Blood, Lymph Nodes, Blood Vessels | | |
| b. Has the Additional Proposed Insured ever had any disorder of: *(circle all that apply)* ........ | | ☐ ☐ |
| Skin, Neck, Back, Spine, Bones, Joints, Eyes, Ears, Thyroid, Heart, Cerebrovascular System, Lungs, Breasts, Gastrointestinal System, Liver, Kidney, Genitourinary System, Immune System, Nervous System, Blood, Lymph Nodes, Blood Vessels | | |
| 5. Within the past 10 years, has any Proposed Insured ever been diagnosed or received treatment for Acquired Immune Deficiency Syndrome (AIDS) or had a positive test for infection by the AIDS (HIV) virus? ........ | ☐ ☑ | ☐ ☐ |
| 6. a. Other than the above, has any Proposed Insured ever had any mental or physical disorder or illness, injury, surgery, or been a patient in a hospital or other medical facility? ........ | ☐ ☑ | ☐ ☐ |
| b. Other than the above, within the past 5 years, has any Proposed Insured had any physical exam, consultation, EKG, X-ray or other medical test? ........ | ☐ ☑ | ☐ ☐ |
| 7. During the past year has any Proposed Insured: | | |
| a. Taken prescription medication? ........ | ☐ ☑ | ☐ ☐ |
| b. Taken non-prescription medications, including herbal, supplements or other alternative therapies/regimens? ........ | ☐ ☑ | ☐ ☐ |

L-17400-10          Page 5

Q1(7)

MAY-18-05   12:32   FROM-AIM Systems, Inc            6782072668        T-636   P 008/054   F-417

## MEDICAL HISTORY (CONTINUED)

|  | Proposed Insured: Yes No | Additional Proposed Insured: Yes No |
|---|---|---|
| 8. Has any Proposed Insured ever used cocaine, marijuana, heroin or any other illicit drug or been advised to restrict the use of alcohol or any other drug? | ☐ ☑ | ☐ ☐ |
| 9. Does any Proposed Insured consume alcoholic beverages? (If "YES," list type, amount and frequency of use.) | ☐ ☑ | ☐ ☐ |

10. a. Proposed Insured: Height: _5_ ft. _6_ in.  Weight: _160_ lbs;  weight loss in past 12 mos. _0_ lbs.
    b. Additional Proposed Insured: Height: ___ ft. ___ in.  Weight: ___ lbs;  weight loss in past 12 mos. ___ lbs.

| 11. Has a parent, brother or sister ever had heart disease, stroke/cerebrovascular disease, cancer, or kidney disease? | ☐ ☑ | ☐ ☐ |

| 12. FAMILY HISTORY | Age (if living) | Condition of Health | Age (at death) | Cause of Death |
|---|---|---|---|---|
| Father of Proposed Insured |  |  | 77 |  |
| Mother of Proposed Insured | 83 | Good |  |  |
| Brothers and Sisters of Proposed Insured | 50/48 | Good |  |  |
| Father of Additional Proposed Insured |  |  |  |  |
| Mother of Additional Proposed Insured |  |  |  |  |
| Brothers and Sisters of Additional Proposed Insured |  |  |  |  |

## DETAILS OF "YES" ANSWERS AND ADDITIONAL INFORMATION

Proposed Insured: _____

_____

_____

_____

_____

_____

_____

Additional Proposed Insured: _____

_____

_____

_____

_____

_____

## TOBACCO/NICOTINE USE

| 13. My use of tobacco/nicotine products, including (but not limited to) cigarettes, cigars, pipes or any smoking materials, snuff, chewing tobacco, nicotine gum or nicotine patch is as indicated below: | Proposed Insured: | Additional Proposed Insured: |
|---|---|---|
| I have never used tobacco/nicotine products of any form. | ☑ | ☐ |
| I have not used tobacco/nicotine products of any form in the past ___ mos. ___ yrs. | ☐ | ☐ |
| I currently use tobacco/nicotine products. | ☐ | ☐ |

L-17400-10                          Page 6

Q1(8)

JUN-15-2005 09:17 FROM:                    4044593840          TO:8603083943          P.3/4
APR-20-2005 01:19 PM   AIE SURGICAL PRACTICE      678 904 4526         P.04

APR-20-2005 13:48 FROM:                    4044593840          TO:678 904 4326        P.4/5

**DECLARATION:** APPLICANT declares to the best of his/her knowledge and belief that all of the statements and answers in Part One and Part Two, if required, are complete and true. APPLICANT UNDERSTANDS AND AGREES THAT: (a) Part One and Part Two, if required, and any supplements will form the basis for any insurance issued; (b) Except as stated in the attached Temporary Insurance Agreement; (1) the insurance will take effect prior to the later of the Issue Date or the Policy Date shown on the Policy Summary if, on the (2) Any insurance issued will take effect on the later of the Issue Date or the Policy Date shown on the Policy Summary if, on the later of the Issue Date or the Policy Date, the health and other conditions relating to insurability remain complete and true as described in this application; and (c) its agent in collecting: (1) to make, alter, or discharge any contract; (2) to waive or change any condition or provision of any contract, application, or receipt or (3) to accept any risk or make any decision concerning insurability. The Proposed Insured(s) will be the Applicant(s) of any contract issued on this application unless otherwise indicated below. The right to privacy is protected as required by law.

**NOTICE OF INSURANCE FRAUD:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties. By signing below, I acknowledge that I have read and understand all the information in this application.

**CONSENT OF PROPOSED INSURED(S)(If applicable):** I consent to the purchase of insurance on my life by the Trust/Corporation and agree on behalf of myself, my heirs, successors and assigns to hold the Company harmless against any claims made on account of the issuance of the policy to the Trust/Corporation.

**ELECTRONIC DELIVERY CONSENT:** By checking "Yes," I agree, to the fullest extent permitted by law, to accept electronic delivery of any documents that the Company may be required to deliver (including statements, prospectuses and reports) in lieu of receiving documents in paper format. I understand that I must have Internet access and provide my email address below and there may be access fees charged by the Internet service provider. I understand that this consent can be revoked at any time and such revocation must be requested in writing.

[X] Yes, I consent.        Owner's Email Address ___Apelo Clekhthelit___

Proposed Insured's Name ___DR IGNATIUS F AKPELE___

→ Proposed Insured's Signature X _____

Additional Proposed Insured's Name _____

Additional Proposed Insured's Signature X _____

Applicant's Signature (if other than Proposed Insured) _____

Date 4/27/05   Application taken at ___ATLANTA GA___
                                        City, State

Agent/Witness' Signature X _____   Date 4/27/05

Agent/Witness' Name ___DAVID M HILSON___   ___JEREMY G TINTO___

Note: If not personally witnessed by the agent, each signature must be witnessed by someone present at the time the application was signed.

**REQUEST FOR BACK DATED POLICY:**

If the Applicant is requesting that the applied for policy be issued with a Policy Date that pre-dates the Issue Date of the policy (a back dated policy) then the Applicant must read and sign below.

Applicant acknowledges that he/she has requested that the policy applied for be issued with a back dated policy selected by the Applicant that pre-dates the Issue Date of the policy. Applicant understands and agrees that if a back dated policy is issued, then the policy premium or charges begin on the Policy Date even though insurance will not take effect until the Issue Date of the policy.

Applicant's Signature

_____   Date 4/27/05

L-17400-10                          Page 7

Q1 (9)



JENNY PRUITT
ASSOCIATES
REALTORS

# PURCHASE AND SALE AGREEMENT

Date: _____ October 27 _____, 20 04 _____

**2002 Printing**

1. **Purchase and Sale.** The undersigned buyer ("Buyer") agrees to buy and the undersigned seller ("Seller") agrees to sell all that tract or parcel of land, with such improvements as are located thereon, described as follows: All that tract of land lying and being in Land Lot __14__ of the __17__ District, ___-___ Section of _____ **Fulton** _____ County, Georgia, and being known as Address **245 TRIMBLE CREST DRIVE** _____, City _____ **Atlanta** _____, Georgia Zip Code __30342__, according to the present system of numbering in and around this area, being more particularly described as Lot __#38__, Block ___-___, Unit _____, Phase/Section _____ of _____ **BROOKHAVEN LAKES** _____ Subdivision, as recorded in Plat Book __234__, Page __119__ _____ **Fulton** _____ County, Georgia records together with all fixtures, landscaping, improvements, and appurtenances, all being hereinafter collectively referred to as the "Property." The full legal description of the Property is the same as is recorded with the Clerk of the Superior Court of the county in which the Property is located and is made a part of this Agreement by reference.

2. **Purchase Price and Method of Payment.** Buyer warrants that Buyer will have sufficient cash at closing, which when combined with the loan(s), if any, referenced herein, will allow Buyer to complete the purchase of the Property. Buyer does not need to sell or lease other real property in order to complete the purchase of the Property. The purchase price of the Property to be paid by Buyer at closing is: **One Million Four Hundred Seventy-Five Thousand** _____ U.S. Dollars, $ **1,475,000.00** subject to the following: *[Select sections A, B, C, and/or D below. The sections not marked are not a part of this Agreement.]*

   ☐ **A. All Cash At Closing:** Buyer shall pay the purchase price to Seller in cash, or its equivalent. Buyer's obligation to close shall not be subject to any financial contingency. Buyer shall pay all closing costs.

   ☐ **B. Loan To Be Assumed:** See Exhibit "_____."

   ☒ **C. New Loan To Be Obtained:** This Agreement is made conditioned upon Buyer's ability to obtain a loan (except if the loan is denied because Buyer lacks sufficient cash to close excluding the amount of the loan and/or because Buyer has not sold or leased other real property) in the principal amount of _____ **70** % of the purchase price listed above, with an interest rate at par of not more than ____ **7.5** % per annum on the unpaid balance, to be secured by a first lien security deed on the Property; the loan to be paid in consecutive monthly installments of principal and interest over a term of not less than __30__ years. "Ability to obtain" as used herein means that Buyer is qualified to receive the loan described herein based upon lender's customary and standard underwriting criteria. The loan shall be of the type selected below: *[The sections not marked are not a part of this Agreement.]*

   **(1) Loan Type:** ☒ Conventional; ☐ FHA (see attached exhibit); ☐ VA (see attached exhibit); ☐ Other (see attached exhibit)

   **(2) Rate Type:** ☐ Fixed Rate Mortgage Loan; ☒ Adjustable Rate Mortgage ("ARM") Loan;

   **(3) Closing Costs and Discount Points:** Seller shall, at the time of closing, contribute a sum not to exceed $ **15,000.00** to be used by Buyer to pay for: (a) preparation of the warranty deed and owner's affidavit by the closing attorney; (b) at Buyer's discretion, closing costs, loan discount points, survey costs, and insurance premiums (including flood insurance, if applicable) relating to the Property and/or loan; and (c) at Buyer's discretion, other costs to close including escrow establishment charges and prepaid items, if allowed by lender. Buyer shall pay all other costs, fees, and amounts for the above referenced items and to fulfill lender requirements to otherwise close this transaction.

   **(4) Closing Attorney:** This transaction shall be closed by the law firm of_____ Campbell & Brannon, L.L.C. _____ **(Steve Golden)** _____. If Buyer is given the right to select a law firm from a mortgage lender's approved list of closing attorney's, Buyer agrees to select the above-named firm. If the above-named firm is not on the mortgage lender's approved list, and cannot be added in time to close this transaction, Buyer may select another law firm from lender's approved list to close this transaction.

   **(5) Loan Obligations:** Buyer agrees to: (a) make application for the loan within ____ **10** ____ days from the Binding Agreement Date; (b) immediately notify Seller of having applied for the loan and the name of the lender; and (c) pursue qualification for and approval of the loan diligently and in good faith. Should Buyer not timely apply for the loan, Seller may terminate the Agreement if Buyer does not, within five days after receiving written notice thereof, cure the default by providing Seller with written evidence of loan application. Buyer agrees that a loan with terms consistent with those described herein shall satisfy this loan contingency. Buyer may also apply for a loan with different terms and conditions and close the transaction provided all other terms and conditions of this Agreement are fulfilled, and the new loan does not increase the costs charged to the Seller. Buyer shall be obligated to close this transaction if Buyer has the ability to obtain a loan with terms as described herein and/or any other loan for which Buyer has applied and been approved. From the Binding Agreement Date until closing, Buyer shall not intentionally make any material changes in Buyer's financial condition which would adversely affect Buyer's ability to obtain a loan. In the event any application of Buyer for a loan is denied, Buyer shall promptly provide Seller with a letter from the lender denying the loan stating the basis for the loan denial.

   ☐ **D. Second Loan to be Obtained,** see Exhibit "_____."

3. **Earnest Money.** Buyer has paid to _____ **Jenny Pruitt & Associates** _____ ("Holder") earnest money of $ **30,000.00** _____ check, OR $ **n/a** _____ cash, which has been received by Holder. The earnest money shall be deposited in Holder's escrow/trust account (with Holder retaining the interest if the account is interest bearing) within five banking days from the

K1(1)

Copyright© 2002 by Georgia Association of REALTORS®, Inc.

Binding Agreement Date and shall be applied toward the purchase price of the Property at the time of closing. In the event any earnest money check is not honored, for any reason, by the bank upon which it is drawn, Holder shall promptly notify Buyer and Seller. Buyer shall have three banking days after notice to deliver good funds to Holder. In the event Buyer does not timely deliver good funds, the Seller shall have the right to terminate this Agreement upon written notice to the Buyer. Holder shall disburse earnest money only as follows: (a) upon the failure of the parties to enter into a binding agreement; (b) at closing; (c) upon a subsequent written agreement signed by all parties having an interest in the funds; (d) upon order of a court or arbitrator having jurisdiction over any dispute involving the earnest money; or (e) upon a reasonable interpretation of this Agreement by Holder. Prior to disbursing earnest money pursuant to a reasonable interpretation of this Agreement, Holder shall give all parties fifteen days notice, stating to whom the disbursement will be made. Any party may object in writing to the disbursement, provided the objection is received by Holder prior to the end of the fifteen-day notice period. All objections not raised in a timely manner shall be waived. In the event a timely objection is made, Holder shall consider the objection and shall do one or more of the following: (a) hold the earnest money for a reasonable period of time to give the parties an opportunity to resolve the dispute; (b) disburse the earnest money and so notify all parties; and/or (c) interplead the earnest money into a court of competent jurisdiction. Holder shall be reimbursed for and may deduct from any funds interpleaded its costs and expenses, including reasonable attorneys= fees. The prevailing party in the interpleader action shall be entitled to collect from the other party the costs and expenses reimbursed to Holder. No party shall seek damages from Holder (nor shall Holder be liable for the same) for any matter arising out of or related to the performance of Holder's duties under this earnest money paragraph. If Buyer breaches Buyer's obligations or warranties herein, holder may pay the earnest money to Seller by check, which if accepted and deposited by Seller, shall constitute liquidated damages in full settlement of all claims of Seller. It is agreed to by the parties that such liquidated damages are not a penalty and are a good faith estimate of Seller's actual damages, which damages are difficult to ascertain.

4. **Closing and Possession.**
   A. **Property Condition:** Seller warrants that at the time of closing or upon the granting of possession if at a time other than at closing, the Property will be in substantially the same condition as it was on Binding Agreement Date, except for normal wear and tear, and changes made to the condition of the Property pursuant to the written agreement of Buyer and Seller. Seller shall deliver Property clean and free of debris at time of possession. If the Property is destroyed or substantially damaged prior to closing, Seller shall promptly notify Buyer of the amount of insurance proceeds available to repair the damage and whether Seller will complete repairs prior to closing. Buyer may terminate this Agreement not later than five days after receiving such notice by giving written notice to Seller. If Buyer does not terminate this Agreement, Buyer shall receive at closing such insurance proceeds as are paid on the claim which are not spent to repair the damage.
   B. **Taxes:** Real estate taxes on said Property for the calendar year in which the sale is closed shall be prorated as of the date of closing. Seller shall pay State of Georgia property transfer tax.
   C. **Timing of Closing and Possession:** This transaction shall be closed on ___December 15___, 20_04_ or on such other date as may be agreed to by the parties in writing, provided, however, that: (1) in the event the loan described herein is unable to be closed on or before said date; or (2) Seller fails to satisfy valid title objections, Buyer or Seller may, by notice to the other party (which notice must be received on or before the closing date), extend this Agreement's closing date and the date for surrender of occupancy if later than the closing date, up to seven days from the above-stated closing date. Buyer agrees to allow Seller to retain possession of the Property through: *[Select sections A, B, or C below. The sections not marked are not a part of this Agreement.]*
      ☒ A. the closing; or ☐ B. _____ hours after the closing;  or ☐ C. _____ days after the closing at _____ m. o'clock
   D. **Warranties Transfer:** Seller agrees to transfer to Buyer, at closing, subject to Buyer's acceptance thereof, Seller's interest in any manufacturer's warranties, service contracts, termite bond or treatment guarantee and/or other similar warranties which, by their terms, may be transferable to Buyer.
   E. **Prorations:** Seller and Buyer agree to prorate all utility bills between themselves, as of the date of closing (or the day of possession of the Property by the Buyer, whichever is the later) which are issued after closing and include service for any period of time the Property was owned/occupied by Seller or any other person prior to Buyer.
   F. **Closing Certifications:** Buyer and Seller shall execute and deliver such certifications, affidavits, and statements as are required at closing to meet the requirements of the lender and of federal and state law.

5. **Title.**
   A. **Warranty:** Seller warrants that, at the time of closing, Seller will convey good and marketable title to said Property by general warranty deed subject only to: (1) zoning; (2) general utility, sewer, and drainage easements of record on the Acceptance Date upon which the improvements do not encroach; (3) subdivision and/or condominium declarations, covenants, restrictions, and easements of record on the Acceptance Date; and (4) leases and other encumbrances specified in this Agreement. Buyer agrees to assume Seller's responsibilities in any leases specified in this Agreement.
   B. **Examination:** Buyer may, prior to closing, examine title and furnish Seller with a written statement of objections affecting the marketability of said title. If Seller fails to satisfy valid title objections prior to closing or any extension thereof, then Buyer may terminate the Agreement upon written notice to Seller, in which case Buyer's earnest money shall be returned. Good and marketable title as used herein shall mean title which a title insurance company licensed to do business in Georgia will insure at its regular rates, subject only to standard exceptions.
   C. **Survey:** Any survey of the Property attached hereto by agreement of the parties prior to the Binding Agreement Date shall be a part of this Agreement. Buyer shall have the right to terminate this Agreement upon written notice to Seller if a new survey performed by a surveyor licensed in Georgia is obtained which is materially different from any attached survey with respect to the Property, in which case Buyer's earnest money shall be returned. The term "materially different" shall not apply to any improvements constructed by Seller in their agreed-upon locations subsequent to Binding Date Agreement. Matters revealed in said survey shall not relieve the warranty of title obligations of Seller referenced above.

6. **Seller's Property Disclosure.** Seller's Property Disclosure Statement is attached hereto and incorporated herein. Seller warrants that to the best of Seller's knowledge and belief, the information contained therein is accurate and complete as of the Binding Agreement Date.

*KI(2)*

**7. Termite Letter.** An official Georgia Wood Infestation Report ("Report" prepared by a licensed pest control operator, covering each dwelling and garage on the Property and dated within one hundred eighty days of the acceptance date is ☐,**OR,** is ☒ not attached to this Agreement as an exhibit. If the Report is not attached, Seller shall provide such a Report to Buyer within seven days from the Binding Agreement Date. Buyer shall have the right to terminate this Agreement within ten days from the Binding Agreement Date if either of the following events occur: (a) the Report is not timely provided to Buyer; or (b) the Report provided after the Binding Agreement Date indicates present infestation of, or damage to, the Property from termites or other wood destroying organisms. If Buyer does not timely give Seller notice of Buyer's decision to terminate this Agreement, Buyer's right to terminate the Agreement pursuant to this paragraph shall be waived. Notwithstanding the above, Buyer shall continue to have whatever other rights to terminate this Agreement, if any, that exist elsewhere in this Agreement.   Unless otherwise noted on the Seller's Property Disclosure Statement, to the best of Seller's knowledge, the information contained in any attached or later provided Report is accurate and complete, and no other termite inspections have been performed or reports issued, the findings of which are inconsistent with the Report attached hereto. Prior to closing, Seller shall treat active infestation of termites and other wood destroying organisms, if any.  At closing, Seller shall provide Buyer with a Report prepared by a licensed pest control operator dated within thirty days of the closing, stating that each dwelling and garage has been found to be free from active infestation of termites and other wood destroying organisms. This paragraph shall not limit Buyer's right to request that Seller repair and/or replace defects resulting from termites and other wood destroying organisms if the Property is sold with the right to request repairs in accordance with the Inspection Paragraph herein.

**8. Inspection.** Buyer and/or Buyer's representatives shall have the right to enter the Property at Buyer's expense and at reasonable times (including immediately prior to closing) to thoroughly inspect, examine, test and survey the Property. This shall include the right to inspect and test for lead-based paint and lead-based paint hazards for not less than ten days from the Binding Agreement Date.  Seller shall cause all utility services and any pool, spa, and similar items to be operational so that Buyer may complete all inspections under this Agreement.  The Buyer agrees to hold the Seller and all Brokers harmless from all claims, injuries, and damages arising out of or related to the exercise of these rights.

*[Select section A or B below.  The section not marked shall not be part of this Agreement.]*

Buyer(s) Initials 

**A. Property Sold With Right to Request Repairs.**

(1) Buyer shall have the right to request that Seller repair and/or replace only defects in the Property identified by Buyer's representative(s) by providing Seller, within _____ **10** _____ days from Binding Agreement Date, with a copy of inspection report(s) and a signed written amendment to this Agreement setting forth the defects noted in the report which Buyer requests be repaired and/or replaced. The term "defects" shall mean any portion of or item in the Property which: (a) is not in good working order and repair (normal wear and tear excepted); (b) constitutes a violation of applicable laws, governmental codes or regulations and is not otherwise grandfathered; or (c) is in a condition which represents a significant health risk or an unreasonable risk of injury or damage to persons or property. If Buyer does not timely present the written amendment and inspection report, Buyer shall be deemed to have accepted the Property "as is" in accordance with paragraph B below.

(2) If Buyer timely submits the inspection report and the written amendment, Buyer and Seller shall have _____ **13** _____ days (hereinafter "Defect Resolution Period") from the Binding Agreement Date to negotiate through written offers and counteroffers the defects to be repaired and/or replaced by Seller.

(3) Neither party may terminate this Agreement prior to the end of the Defect Resolution Period due to the failure to agree on the repair and/or replacement of defects without the written consent of the other party.

(4) If Seller at any time during the Defect Resolution Period notifies Buyer that Seller will repair and/or replace all of the defects listed in the initial amendment submitted by Buyer, an agreement on the repair and/or replacement of defects shall be deemed to have been reached and all parties shall execute an amendment to that effect.

(5) If Buyer and Seller have not within the Defect Resolution Period agreed on the defects to be repaired and/or replaced by signing a written amendment to this Agreement, Buyer may either accept the last unexpired counteroffer of Seller or accept the Property "as is" in accordance with paragraph B below, by giving notice to Seller within three days after the end of the Defect Resolution Period.  If Buyer fails to timely give this notice, this Agreement shall terminate immediately, and Buyer's earnest money shall be returned in accordance with the Earnest Money paragraph above.  All agreed-upon repairs and replacements shall be completed in a good and workmanlike manner prior to closing.

Buyer(s) Initials ☐

**OR**

**B. Property Sold "As Is."**  All parties agree that the Property is being sold "as is," with all faults including but not limited to lead-based paint and lead-based paint hazards and damage from termites and other wood destroying organisms.  The Seller shall have no obligation to make repairs to the Property.

**9. Other Provisions.**

**A. Binding Effect, Entire Agreement, Modification, Assignment:**  This Agreement shall be for the benefit of, and be binding upon, Buyer and Seller, their heirs, successors, legal representatives and permitted assigns.  This Agreement constitutes the sole and entire agreement between the parties hereto and no modification or assignment of this Agreement shall be binding unless signed by all parties to this Agreement.  No representation, promise, or inducement not included in this Agreement shall be binding upon any party hereto.  Any assignee shall fulfill all the terms and conditions of this Agreement.

**B. Survival of Agreement:**  All conditions or stipulations not fulfilled at time of closing shall survive the closing until such time as the conditions or stipulations are fulfilled.

**C. Governing Law:**  This Agreement may be signed in multiple counterparts, is intended as a contract for the purchase and sale of real property and shall be interpreted in accordance with the laws of the State of Georgia.

*KI(3)*

D. **Time of Essence:** Time is of the essence of this Agreement.

E. **Terminology:** As the context may require in this Agreement: (1) the singular shall mean the plural and vice versa; and (2) all pronouns shall mean and include the person, entity, firm, or corporation to which they relate.

F. **Responsibility to Cooperate:** All parties agree to timely take such actions and produce, execute, and/or deliver such information and documentation as is reasonably necessary to carry out the responsibilities and obligations of this Agreement.

G. **Notices.** Except as otherwise provided herein, all notices, including offers, counteroffers, acceptances, amendments and demands, required or permitted hereunder shall be in writing, signed by the party giving the notice and delivered either: (1) in person, (2) by an overnight delivery service, prepaid, (3) by facsimile transmission (FAX) (provided that an original of the notice shall be promptly sent thereafter if so requested by the party receiving the same) or (4) by the United States Postal Service, postage prepaid, registered or certified return receipt requested. The parties agree that a faxed signature of a party constitutes an original signature binding upon that party. Notice shall be deemed to have been given as of the date and time it is actually received. Notwithstanding the above, notice by FAX shall be deemed to have been given as of the date and time it is transmitted if the sending FAX produces a written confirmation with the date, time and telephone number to which the notice was sent. Receipt of notice by the Broker representing a party as a client shall be deemed to be notice to that party for all purposes herein, except in transactions where the Broker is practicing designated agency, in which case, receipt of notice by the designated agent representing a party as a client shall be required to constitute notice. All notice requirements referenced herein shall be strictly construed.

10. **Disclaimer.** Buyer and Seller acknowledge that they have not relied upon any advice, representations or statements of Brokers and waive and shall not assert any claims against Brokers involving the same. Buyer and Seller agree that Brokers shall not be responsible to advise Buyer and Seller on any matter including but not limited to the following: any matter which could have been revealed through a survey, title search or inspection of the Property; the condition of the Property, any portion thereof, or any item therein; building products and construction techniques; the necessity or cost of any repairs to the Property; hazardous or toxic materials or substances; termites and other wood destroying organisms; the tax or legal consequences of this transaction; the availability and cost of utilities or community amenities; the appraised or future value of the Property; any condition(s) existing off the Property which may affect the Property; the terms, conditions and availability of financing; and the uses and zoning of the Property whether permitted or proposed. Buyer and Seller acknowledge that Brokers are not experts with respect to the above matters and that, if any of these matters or any other matters are of concern to them, they should seek independent expert advice relative thereto. Buyer further acknowledges that in every neighborhood there are conditions which different buyers may find objectionable. Buyer shall therefore be responsible to become fully acquainted with neighborhood and other off site conditions which could affect the Property.

11. <u>**Agency and Brokerage.**</u>
   A. **Agency.**
      (1) In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and where the context would indicate the broker's affiliated licensees. No Broker in this transaction shall owe any duty to Buyer or Seller greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. §10-6A-1 et .seq.;
      (2) Seller and Buyer acknowledge that if they are not represented by a Broker they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for that party.
      (3) The Broker, if any, working with the Seller is identified on the signature page as the "Listing Broker"; and said Broker is ☒, **OR**, is **NOT** ☐ representing the Seller;
      (4) The Broker, if any, working with the Buyer is identified on the signature page as the "Selling Broker",and said Broker is ☒, **OR**, is **NOT** ☐ representing the Buyer; and
      (5) If Buyer and Seller are both being represented by the same Broker, a relationship of either designated agency ☐, **OR**, dual agency ☐ shall exist.
         (a) **Dual Agency Disclosure.** *[Applicable only if dual agency has been selected above]* Seller and Buyer are aware that Broker is acting as a dual agent in this transaction and consent to the same. Seller and Buyer have been advised that:
            1 - In serving as a dual agent the Broker is representing two clients whose interests are or at times could be different or even adverse;
            2 - The Broker will disclose all adverse, material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from another client which is not otherwise required to be disclosed by law;
            3 - The Buyer and Seller do not have to consent to dual agency; and
            4 - The consent of the Buyer and Seller to dual agency has been given voluntarily and the parties have read and understood their brokerage engagement agreements.
            5 - Notwithstanding any provision to the contrary contained herein, Seller and Buyer each hereby direct Broker, while acting as a dual agent, to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position.
         (b) **Designated Agency Assignment.** *[Applicable only if the designated agency has been selected above]* The Broker has assigned _____ to work exclusively with Buyer as Buyer's designated agent and _____ to work exclusively with Seller as Seller's designated agent. Each designated agent shall exclusively represent the party to whom each has been assigned as a client and shall not represent in this transaction the client assigned to the other designated agent.

*VA (4)*

Copyright© 2002 by Georgia Association of REALTORS®, Inc.

(c) **Material Relationship Disclosure.** The Broker and/or affiliated licensees have no material relationship with either client except as follows:_____ **n/a**_____
(A material relationship means one actually known of a personal, familial or business nature between the Broker and affiliated licensees and a client which would impair their ability to exercise fair judgment relative to another client.)

B.   **Brokerage.** The Broker(s) identified herein have performed valuable brokerage services and are to be paid a commission pursuant to a separate agreement or agreements.  Unless otherwise provided for herein, the Listing Broker will be paid a commission by the Seller, and the Selling Broker will receive a portion of the Listing Broker's commission pursuant to a cooperative brokerage agreement.  The closing attorney is directed to pay the commission of the Broker(s) at closing out of the proceeds of the sale. If the sale proceeds are insufficient to pay the full commission, the party owing the commission will pay any shortfall at closing.  If more than one Broker is involved in the transaction, the closing attorney is directed to pay each Broker their respective portion of said commission. In the event the sale is not closed because of Buyer's and/or Seller's failure or refusal to perform any of their obligations herein, the non-performing party shall immediately pay the Broker(s) the full commission the Broker(s) would have received had the sale closed, and the Selling Broker and Listing Broker may jointly or independently pursue the non-performing party for their portion of the commission.

12.   **Time Limit of Offer.** This instrument shall be open for acceptance until_____**8**_____ o'clock _____**P**.M. on the ___**29**___ day of _____**October**_____, 20**04**____.

13.   **Exhibits and Addenda.**  All exhibits and/or addenda attached hereto, listed below, or referenced herein are made a part of this Agreement.  If any such exhibit or addendum conflicts with any preceding paragraph, said exhibit or addendum shall control:

   **Exhibit B - Association/Assessment Fee Exhibit**
   **Exhibit C - Appraisal on 245 Trimble Crest Drive**

**SPECIAL STIPULATIONS:** The following Special Stipulations, if conflicting with any exhibit, addendum, or preceding paragraph, shall control.

**Acknowledgement of Receipt of Disclosure.** I/We have received the Affiliated Business Arrangement Disclosure Statement from Jenny Pruitt & Associates and understand that Jenny Pruitt & Associates may refer me/us to the service providers listed in that disclosure.  Jenny Pruitt & Associates may receive a financial or other benefit as the result of that referral.

☐ **(Mark box if additional pages are attached.)**

| | |
|---|---|
| **JENNY PRUITT ASSOCIATES**       ( **JENN01** ) | Buyer's Signature: |
| Selling Broker              MLS Office Code | |
| By:_____ | Print or Type Name: _____**Ignatius E.  Akpele**_____ |
| Broker or Broker's Affiliated Licensee | |
| Print or Type Name:____**KATHERINE  BLASKA**____ | Buyer's Signature: |
| Bus. Phone:___**404-250-9900**___ FAX # ___**404-250-0894**___ | Print or Type Name: ___**Uzoamaka A. Akpele**___ |
| Multiple Listing #_____**974234**_____ | |
| **JENNY PRUITT ASSOCIATES**      ( **JENN01** ) | Seller's Signature: |
| Listing Broker            MLS Office Code | |
| By:_____ | Print or Type Name:_____ |
| Broker or Broker's Affiliated Licensee | Seller's Signature: |
| Print or Type Name: ___**MARILYN J. ROWLAND**___ | Print or Type Name:_____ |
| Bus. Phone:___**404-250-9900**___ FAX#___**404-250-0894**___ | |

**Acceptance Date**
The above proposition is hereby accepted, _____ o'clock_____ m. on the_____ day of _____, 20_____.

**Binding Agreement Date**
This instrument shall become a binding agreement on the date ("Binding Agreement Date") when notice of the acceptance of this Agreement has been received by offeror.  The offeror shall promptly notify offeree when acceptance has been received.

Copyright© 2002 by Georgia Association of REALTORS®, Inc.                    Revised 04/19/02 F20, Purchase and Sale Agreement, Page 5 of 5 01/01/02



# SPECIAL STIPULATIONS CONTINUED



2002 Printing

**Property Address:**

245 TRIMBLE CREST DRIVE

Atlanta ,Georgia  30342

*[NOTE:  The language set forth in this special stipulation(s) is furnished by the parties and is particular to this transaction.]*

1.  BUYER SHALL HAVE TEN (10) DAYS FROM THE DATE OF BINDING AGREEMENT TO GET PREAPPROVED FOR A LOAN. IF THE LENDER CANNOT PREAPPROVE BUYER FOR SAID LOAN, THEN BUYER MAY AT BUYER'S OPTION DECLARE THIS AGREEMENT NULL AND VOID BY PROVIDING WRITEN NOTICE TO SELLER, AND ALL EARNEST MONEY SHALL BE REFUNDED TO THE BUYER.

2.  INSPECTION PERIOD TO BEGIN WITHIN 24 HOURS AFTER THE PREAPPROVAL CONTINGENCY (REFERENCE # 1 ABOVE) ON THIS AGREEMENT IS REMOVED.

3.  THE FOLLOWING ITEMS SHALL REMAIN WITH THE PROPERTY AT NO COST TO BUYERS:  ANY AND ALL CHANDELIERS, THE ARMOIRE LOCATED IN THE DOWNSTAIRS DEN.

4.  SELLER TO PROVIDE BUYER WITH A SELLER'S PROPERTY DISCLOSURE STATEMENT WITHIN 48 HOURS OF BINDING AGREEMENT DATE.  IF BUYER IS UNSATISFIED WITH ANY PART OF SAID DISCLOSURE, THE BUYER MAY AT BUIYER'S OPTION DECLARE THIS AGREEMENT NULL AND VOID AND ALL EARNEST MONEY SHALL BE REFUNDED TO BUYER.  IF THE PROPERTY IS SOLD WITH THE RIGHT TO REQUEST REPAIRS IN ACCORDANCE WITH PARAGRAPH 8A, BUYER MAY REQUEST IN BUYER'S INSPECTION AMENDMENT THAT SELLER REPAIR, AMONG OTHER THINGS, ANY DEFECTS REVEALED IN THE SELLER'S PROPERTY DISCLOSURE.

5.  SELLER TO TRANSFER ANY EXISTING HOME WARRANTIES ON THE PROPERTY TO BUYER PRIOR TO CLOSING.  ALL WARRANTIES SHALL BE PROVIDED WITH WRITTEN DOCUMENTATION.

☐ **(Mark box if additional pages are attached.)**

Selling Broker's Initials: _____ KB _____
(or Broker's Affiliated Licensee)

Listing Broker's Initials: _____
(or Broker's Affiliated Licensee)

Buyer's Initials: _____ , _____

Seller's Initials: _____ / _____

K1 (6)

Copyright© 2002 by Georgia Association of REALTORS®, Inc.

F21, Special Stipulations Continued  01/01/02



# ASSOCIATION/ASSESSMENT FEE
# EXHIBIT " __B__ "



**2002 Printing**

This Exhibit is part of the Agreement with an Offer Date of _____**OCTOBER 27**_____ , 20 **04**_____ for the purchase and sale of that certain Property known as:_____ **245 TRIMBLE CREST DRIVE**_____ , **Atlanta**_____ , Georgia **30342** .

Unit _____ , Building _____-_____ , Project/Subdivision _____ **BROOKHAVEN LAKES**_____
described in the Declaration and Plat and any amendments thereto of record in said county; together with such Unit's undivided interest in the common elements designated by the Declaration including those elements appurtenant to the Unit and such other rights to use the common elements which have been specially assigned to the Unit.

**Buyer acknowledges that Buyer has the right and responsibility to review all applicable documents and declarations pertaining to the Property.**

**ASSOCIATION FEES.** *[Select A or B, and C, D or E; the ones not marked are not a part of this Agreement]:*

☒ **A. Mandatory.** Buyer and Seller acknowledge that there is a required association fee in the approximate amount of $ **1700.00** per year with an initiation fee of $_____ ; said fee is made payable to _____
Telephone #_____ , and is due on the _____ day of each month. Fees shall be current as of the date of closing. Fees paid in advance by Seller, if any, shall be prorated as of the date of closing.

☐ **B. Not Mandatory.** Buyer and Seller acknowledge that there is not a required association fee. Buyer and Seller acknowledge that there is an association fee in the approximate amount of $_____ per year with an initiation fee of $_____ ; said fee is made payable to _____ , Telephone #_____ , and is due on the _____ day of each month. Fees shall be current as of the date of closing. Fees paid in advance by Seller, if any, shall be prorated as of the date of closing.

**If either A or B above is checked, the following services are Included in the association fee.** *(The unchecked items are not included or are unknown):*

| | | | | | |
|---|---|---|---|---|---|
| ☐ | Exterior Building & Grounds Maintenance | ☐ | Exterior Liability | ☐ | Security |
| ☐ | Swim | ☐ | Fire Insurance | ☐ | Electricity |
| ☐ | Cable | ☐ | Reserve Fund | ☐ | Garbage |
| ☐ | Pest Control & Termite | ☐ | Tennis | ☐ | Sewer |
| ☐ | Gas | ☐ | Water | | |

☐ **C. No Association.** Buyer and Seller acknowledge that there is no association.

☒ **D. No Assessments.** Buyer and Seller acknowledge that there are no special assessments either due or under consideration by the association.

☐ **E. Special Assessment.** Buyer and Seller acknowledge that there is the following special assessment current due or under consideration by the association: _____
The amount of the special assessment due or under consideration is $_____ , and _____ shall pay said assessment at closing.

Selling Broker's Initials: _____**KB**_____            Buyer's Initials: _____ , _____
(or Broker's Affiliated Licensee)

Listing Broker's Initials: _____            Seller's Initials: _____ , _____
(or Broker's Affiliated Licensee)

*KI(7)*

Copyright© 2002 by Georgia Association of REALTORS®, Inc.                    F123, Association/Assessment Fee Exhibit 01/01/02

(Page 1 of 5)

OCT 12 '10 15:50 FR OPPENHEIMER     4042317012 TO 915154574405    P.02/05

Oct 11 2010 12:25:14        →    4042317012 MetLife        Page 002

# MetLife

**MetLife Insurance Company of Connecticut**

Pension/Profit Sharing/401(k)
Annuity Surrender Request
for Qualified Plans With MetLife Tax Reporting

| Return this form to:<br>MetLife<br>PO Box 9146<br>Des Moines, IA 50306-9146 | Overnight Mail only:<br>MetLife<br>4700 Westown Parkway, Ste. 200<br>West Des Moines, IA 50266 |
|---|---|
| **Fax: 515-457-4405** | |

**Participant:**
1. Complete Sections A through I **and sign in Section I.**
2. Send form to your Trustee/Plan Administrator/Third Party Administrator (TPA) who will complete and forward it to MetLife.

**Trustee/Plan Administrator/TPA:**
1. Review Sections A through I.
2. Complete Sections J through M **and sign in Section M.**
3. Mail or fax completed form to MetLife (see above).

**Note:** Be sure to completely fill in your sections. Incomplete information will cause a delay in processing.

## A. PARTICIPANT INFORMATION ☐ Check if new address

| Plan Name: **IGNATIUS E. AKPELE DEFINED BENEFIT PN** | The following items must be completed: |
|---|---|
| Participant Name: **IGNATIUS E. AKPELE** | Case No.: |
| Participant Address: **245 TRIMBLE CREST DRIVE** | Account No. (one per form): **0 5 4 0 9 4 8** |
| **ATLANTA, GA 30342** | Soc. Sec. No.: ▓▓▓▓▓▓▓ |

## B. TYPE OF SURRENDER (Please check only one box)

☒ **Full Surrender** – your account will be closed unless noted otherwise below:

☐ **Partial Surrender** – fill in amount $_____
Indicate if check amount should be gross or net:
☐ Gross – amount **before** taxes and charges
☐ Net – amount **after** taxes and charges
If neither box is checked, the surrender will be processed as a **gross** distribution.
**Note:** Partial distributions will be prorated from **ALL** contracts and from all funding options elected therein unless you note otherwise in Section F Special Instructions.

## C. SURRENDER REASON (Please consult with your Trustee/Plan Administrator/TPA before completing this section. Please check only **ONE** box. If you check more than one box, processing will be delayed.)

☐ **Termination of Employment** (please complete all three items below):
Date of hire: _____ Date of termination: _____ Date of last contribution: _____
You may elect federal tax withholding greater than the required 20%. Indicate total federal tax to be withheld: ____%

☐ **Normal Retirement Age** (as defined by plan)
You may elect federal tax withholding greater than the required 20%. Indicate total federal tax to be withheld: ____%

☐ **Disability**
You may elect federal tax withholding greater than the required 20%. Indicate total federal tax to be withheld: ____%

☐ **In-Service Withdrawal** (indicate dollar amount in Partial Surrender Section B)
You may elect federal tax withholding greater than the required 20%. Indicate total federal tax to be withheld: ____%

☐ **Dissolution of Plan** (check only if advised by Trustee/Plan Administrator/TPA)
You may elect federal tax withholding greater than the required 20%. Indicate total federal tax to be withheld: ____%

☐ **Death of Participant**

☐ **Excess Salary Deferrals** (check only if advised by Trustee/Plan Administrator/TPA) (indicate dollar amount in Partial Surrender Section B)
You may elect federal tax withholding: ☐ 20% ☐ 10% ☐ Other: _____ If no box is checked, no taxes will be withheld.

*K2(i)*

L-18150 Rev. 3-10                     1 of 4

Akpele 00705

Akpele 0863

OCT 12 '10 15:51 FR OPPENHEIMER          4042317012 TO 915154574405      P.03/05

☐ **Correction of Contributions** (indicate dollar amount in Partial Surrender Section B)
You may elect federal tax withholding: ☐ 20% ☐ 10% ☐ Other:_____  If no box is checked, no taxes will be withheld.

☐ **Required Minimum Distribution** (indicate dollar amount in Partial Surrender Section B)
You may elect federal tax withholding: ☐ 20% ☐ 10% ☐ Other:_____  If no box is checked, no taxes will be withheld.

☐ **Hardship Withdrawals** (indicate dollar amount in Partial Surrender Section B)
NOTE: A surrender is not allowed from a Safe Harbor source for the purpose of a hardship withdrawal.
You may elect federal tax withholding: ☐ 20% ☐ 10% ☐ 0%  Other:_____  If no box is checked, 10% will be withheld.

☒ **Change of Investment Provider Within Same Plan** (for plans with multiple investment providers)

☐ **Loan Administered by TPA**

☐ **Qualified Domestic Relations Order (QDRO)**

☐ **New Hire Opt Out**  (Must be submitted within 90 days from the first contribution)
You may elect federal tax withholding greater than the required 20%. Indicate total federal tax to be withheld: _____%.

## D. INCOME TAX WITHHOLDING

The distribution you receive is generally subject to MANDATORY 20% Federal Income Tax withholding and State Income Tax withholding, where required, unless the distribution is paid directly to another eligible retirement plan as a direct rollover. By signing in Section I Signature of Participant, I acknowledge receipt of Notification of Federal Income Tax Withholding on Pension/Profit Sharing (Section 401 of the Internal Revenue Code) distributions.

**State Income Tax Withholding** If Federal Income Tax is withheld, we will automatically withhold State Income Tax where required. If your state has optional State Income Tax withholding and you would like tax withheld, please check this box and fill in percentage:  ☐ _____%

## E. INDICATE PAYEE (Please check only one box)

☐ Participant (as indicated in Section A) (A 1099R Form will be sent to the IRS reporting a taxable distribution.)
☐ Plan
☒ Third Party (Please check only one box and then complete name and address)
☐ MetLife IRA   ☐ Other IRA   ☐ Qualified Pension/Profit Sharing plan   ☒ 403(b)   ☐ 457
Third Party Name:  PACIFIC LIFE
Third Party Address:  P.O. BOX 237B, OMAHA, NE 68103-237B

## F. SPECIAL INSTRUCTIONS – PARTICIPANT

FOR COMPLETION OF 1035 EXCHANGE/TRANSFER TO VARIABLE ANNUITY WITH
PACIFIC LIFE – SURRENDER REASON NOT INDICATED

## G. SPOUSAL CONSENT

Please provide the following information to assist the Trustee/Plan Administrator/TPA. MetLife does not monitor Spousal Consent.

☒ I AM NOT MARRIED   _Signature of Participant_                       10/11/2010
                                                                            Date

☐ I, _____, am the spouse of the Participant. I hereby consent to the distribution to the Participant from the above captioned annuity contract as set forth above. I understand that this distribution is in a form other than a qualified Joint and Survivor Annuity, to which I am entitled by law.

_____    _____    _____    _____    _____
Signature of Spouse            Date      Signature of Notary Public   Commission Expires   Date

This surrender is in accordance with the provisions of the Employer's Pension/Profit Sharing plan and appropriate spousal consent has been obtained.

L-18150 Rev. 3-10                                                                    2 of 4

K2(2)

Akpele 0864

OCT 12 '10 15:52 FR OPPENHEIMER          4042317012 TO 915154574405      P.05/05

## SECTIONS J THROUGH M TO BE COMPLETED BY TRUSTEE/PLAN ADMINISTRATOR/TPA

**J. VESTING PERCENTAGE** (to be completed by Trustee/Plan Administrator/TPA for accounts with employer funds)
For each source, indicate percentage or dollar amount **OR** check box to indicate source is not applicable.

| | | | |
|---|---|---|---|
| Employer Match: | _100_ % | **OR** | ☒ Not applicable |
| Employer Discretionary: | ____ % | **OR** | ☒ Not applicable |
| Other Employer Contributions: | ____ % | **OR** | ☒ Not applicable |
| After-Tax Money: | $ _____ (cost basis) | **OR** | ☒ Not applicable |

Highly Compensated Employee ☐ Yes ☒ No

The non-vested account balance will be transferred to the employer forfeiture account and will be applied based on the allocation instructions on file for the forfeiture account, unless noted otherwise in Section L Special Instructions.

**K. OUTSTANDING LOANS** (to be completed by Trustee/Plan Administrator/TPA for accounts with outstanding loans)
Please check only one box.

☐ Pay off loan (check attached)
☐ Transfer loan to new qualified plan
☐ Default loan
☐ For loans administered by TPA, please indicate the default amount $ _____

**L. SPECIAL INSTRUCTIONS - TRUSTEE/PLAN ADMINISTRATOR/TPA**

**M. SIGNATURE OF TRUSTEE/PLAN ADMINISTRATOR/TPA**

_Jonathan Akpele_, TTEE Akpele          ( 404 ) 256-9618
Signature of Trustee/Plan Administrator                      Trustee/Plan Administrator Phone

_Jonathan Akpele_                         ( 404 ) 256-9618
Signature of Third Party Administrator                       TPA Phone

K2(3)

L-18150 Rev. 3-10                                            4 of 4

Akpele 0865



125 Broad Street, New York, NY 10004

| Annuity Purchase Client Acknowledgment Letter |

_____      IGNATIUS E. AKPELE DEFINED BENEFIT PLAN
Oppenheimer Account Number           Owner Name

I/We (collectively "I") placed an order with Oppenheimer & Co. Inc. on _____ to purchase
                                                                              (date)
**PACLIFE PACIFIC VALUE VARIABLE ANNUITY** with funds from ☐ Oppenheimer Account for the amount of $ 1,138,638.91
(Insurance company & product name)          ☑ Exchange – outside source
                                            ☐ Outside Check                              (dollar amount)

I would like to effect this transaction for the following reasons (check all that apply):

☑ Death benefit   ☑ Income   ☐ Long-term growth   ☐ Principal protection   ☐ Tax deferral (NQ only)

☐ Other (please describe) _____

The annuity I am purchasing has a surrender charge period of **7** _____ years that declines annually as follows:

__**9**__ , __**8**__ , __**7**__ , __**7**__ , __**6**__ , __**6**__ , __**4**__ , _____ , _____ , _____

I have been advised that annuities are subject to the following annual expenses:   Mortality & Expense: **1.40** %
                                                                          + Riders/Benefits: **0.50** %
                                                                          +Fund Management Fees: **0.73** %
                                                                          = Total Annual Expenses: **2.63** %

I acknowledge that there are certain risk factors, including fluctuation of principal value, associated with this investment and that historical performance does not guarantee future results.

I also understand that there may be tax implications associated with this product and that Oppenheimer & Co. Inc. recommends that I consult a tax professional. Oppenheimer & Co. Inc does not provide legal or tax advice.

---

**IF USING QUALIFIED FUNDS, PLEASE COMPLETE THIS SECTION**

*I have been advised that annuities are long-term investments and in the event a withdrawal is taken prior to age 59 ½ I may be subject to a surrender charge and a tax penalty.*

*I acknowledge that I am not receiving any additional tax deferred benefits by purchasing a tax deferred investment product.*

Client Initials: _____

This product **DOES** / **DOES NOT** (circle one) allow for required minimum distributions that exceed the penalty free withdrawal provision.

---

Version 04/2008                                                        Page 1 of 2

*K 3(1)*

Akpele 0861



**O**PPENHEIMER

125 Broad Street, New York, NY 10004

| Annuity Purchase Client Acknowledgment Letter |

---

**IF THE ANNUITY HAS A BONUS FEATURE, PLEASE COMPLETE THIS SECTION**

I/We (collectively "I") acknowledge that the  PACLIFE PACIFIC VALUE VARIABLE ANNUITY
(Insurance company & product name)
annuity I am purchasing has a bonus feature (contract credit) that will credit my new contract ⁵ _____ %
on the amount of the investment. This bonus amount is approximately $ _5b,92b.00_

I have been advised of the total annual expenses and have been advised that annuities with a bonus typically charge higher fees than products that do not include the bonus feature.  I have also been advised that surrender periods may be longer in products with a bonus feature.

I understand that the bonus being received at the time the contract is established will be subject to a charge-back by the Insurance Company in the event of death within _1_____ year (s), which will reduce the amount received by my beneficiary.

**For Exchanges Only:** I acknowledge that the bonus amount credited to my new variable annuity investment, reduced by the surrender charge on my original annuity/policy/fund, will leave a net $ _5b,92b.00_   [ gain / loss].
circle one

---

**Variable annuities are long-term, tax-deferred investment vehicles designed for retirement. Earnings are taxable as ordinary income when distributed and, if withdrawn before age 59 ¹ᐟ², may be subject to a 10% federal tax penalty. Variable annuities involve investment risks and may lose value.  A surrender charge may be applicable if withdrawn early.**

**This letter is given to you to confirm my understanding of the transactions indicated above and to authorize you to execute this transfer for me.**

_Ignet AR,cn_        _9/21/10_        IGNATIUS E. AKPELE
Owner's Signature                    Date                    Owner's name (Please Print)

_____        _____        _____
Joint Owner's Signature                    Date                    Joint Owner's Name (Please Print)

All account holders must sign.

_[signature]_        _9/21/10_        TINTLE / BROWN
Financial Advisor's Signature                    Date                    Financial Advisor's Name (Please Print)

_Ann Greene_        _9/22/10_        _Ann Greene_
Branch Manager's Signature                    Date                    Branch Manager's Name (Please Print)

Version 04/2008                                                            Page 2 of 2

K3(2)

Akpele 0862

Loan #:

# 1-4 FAMILY RIDER
### Assignment of Rents

THIS 1-4 FAMILY RIDER is made this 24th          day of  April            , 1995
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Note to

PARKWAY MORTGAGE, INC.

                                                                                                    (the "Lender")
of the same date and covering the Property described in the Security Instrument and located at:

5070 FALCON CHASE LANE, ATLANTA, GEORGIA  30342
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the
Property described in the Security Instrument, the following items are added to the Property description, and shall
also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every
nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the
Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling,
electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control
apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers,
disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain
rods, attached mirrors, cabinets, panelling and attached floor coverings now or hereafter attached to the Property,
all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the
Property covered by the Security Instrument. All of the foregoing together with the Property described in the
Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4
Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a
change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change.
Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body
applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior
to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other
hazards for which insurance is required by Uniform Covenant 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Uniform Covenant 18 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, the first
sentence in Uniform Covenant 6 concerning Borrower's occupancy of the Property is deleted. All remaining
covenants and agreements set forth in Uniform Covenant 6 shall remain in effect.

MULTISTATE 1 - 4 FAMILY RIDER - Fannie Mae/Freddie Mac Uniform Instrument                Form 3170 3/93
Page 1 of 2

-57 0006.01      VMP MORTGAGE FORMS - (800)521-7291      

BOOK 20182 PAGE 109

**G. ASSIGNMENT OF LEASES.** Upon Lender's request, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to paragraph 21 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender on Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Uniform Covenant 7.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
IGNATIUS E  AKPELE                -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                  -Borrower                                              -Borrower

Page 2 of 2                                                                 Form 3170 3/93

BOOK 2018**2**P110

26964
0203

GEORGIA, FULTON COUNTY
FILED AND RECORDED

99 MAY 17 AM 8: 30

JUANITA HICKS
CLERK OF SUPERIOR COURT

After Recordation Return to:

**JACKSON AND HARDWICK**
1707 Mount Vernon Road
Atlanta, Georgia 30338

AP# AKPELE 061751
LN# 32395E

———— [Space Above This Line For Recording Data] ————

# SECURITY DEED

THIS SECURITY DEED ("Security Instrument") is given on    May 6, 1999    . The grantor is
DR. IGNATIUS AKPELE

GEORGIA INTANGIBLE TAX PAID
$ 1200.00
TRANSACTION #: 204013

MAY 17 1999

SUPERIOR COURT CLERK, FULTON
COUNTY, GEORGIA
C. Young
DEPUTY CLERK

("Borrower"). This Security Instrument is given to
Fidelity National Mortgage Corp

which is organized and existing under the laws of                                , and whose
address is 415 Grayson Highway, Lawrenceville, GA 30245

("Lender"). Borrower owes Lender the principal sum of
Four Hundred Thousand and no/100

Dollars (U.S. $ 400,000.00        ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for
monthly payments, with the full debt, if not paid earlier, due and payable on        June 1, 2014        .
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals,
extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to
protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this
GEORGIA-Single Family-FNMA/FHLMC UNIFORM INSTRUMENT

-6R(GA) (9602)                Form 3011 9/90
Page 1 of 2    MW 02/96          Amended 8/91
VMP MORTGAGE FORMS - (800)521-7291

BOOK 26964 PAGE 203

KS (1)

26964
0204

Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in FULTON County, Georgia:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 15 OF THE 17TH DISTRICT, FULTON COUNTY, GEORGIA, BEING LOT 28 OF FALCON CHASE SUBDIVISION, AS PER PLAT RECORDED IN PLAT BOOK 159, PAGE 75, FULTON COUNTY, GEORGIA RECORDS, WHICH PLAT IS INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

which has the address of 5070 FALCON CHASE LN., ATLANTA                    [Street, City],
Georgia 30342                [Zip Code] ("Property Address");

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

BOOK 26964 PAGE 204

-6R(GA) (9603)                Page 2 of 7                    Initials _____        Form 3011  9/90

KS(2)

26964
0205

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

K S(3)

26964
0206

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

⊛ -6R(GA) (9802)                    Page 4 of 7                    BOOK 26964 PAGE 206                    Form 3011 9/90

26964
0207

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

KS(5)

26964
0208

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by applicable law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale to Borrower in the manner provided in paragraph 14 and shall give notice of sale by public advertisement for the time and in the manner prescribed by applicable law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by law.

If the Property is sold pursuant to this paragraph 21, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with applicable law.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

23. Waiver of Homestead. Borrower waives all rights of homestead exemption in the Property.

24. Assumption not a Novation. Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

25. Security Deed. This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

26. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)]

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
| ☐ Graduated Payment Rider | ☒ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ Balloon Rider | ☐ Rate Improvement Rider | ☐ Second Home Rider |
| ☐ VA Rider | ☒ Other(s) [specify] WAIVER OF BORROWER'S RIGHTS AND CLOSING ATTORNEY'S AFFIDAVIT | |

BOOK 26964 PAGE 208   Initials:

⬤ -6R(GA) (9603)                          Page 6 of 7                          Form 3011  9/90

KS(6)

26964
0209

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it. IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

Signed, sealed and delivered in the presence of:

_____

Unofficial Witness

_____ (Seal)
DR. IGNATIUS AKPELE                -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                                   -Borrower

Notary Public,                     County

NOTARY
EXPIRES
GEORGIA
NOV. 29, 2003
PUBLIC
OCONEE COUNTY

BOOK 26964 PAGE 209

-6R(GA) 0000          Page 7 of 7          Form 3011  9/90

KS (7)

26964
0210

# PLANNED UNIT DEVELOPMENT RIDER

**THIS PLANNED UNIT DEVELOPMENT RIDER** is made this   6th   day of   May
1999   , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to
Fidelity National Mortgage Corp

(the "Lender")
of the same date and covering the Property described in the Security Instrument and located at:

5070 FALCON CHASE LN.,ATLANTA,GA 30342
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

(the "Declaration").

The Property is a part of a planned unit development known as

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Hazard Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," then:

(i)    Lender waives the provision in Uniform Covenant 2 for the monthly payment to Lender of the yearly premium installments for hazard insurance on the Property; and

(ii)   Borrower's obligation under Uniform Covenant 5 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or blanket policy.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, with any excess paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3150 9/90
Page 1 of 2
(logo) -7 (9108).01  MW 08/91          VMP MORTGAGE FORMS - (800)521-7291          Initials:

BOOK **26964** PAGE **210**

KS (8)

26964
0211

D. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Uniform Covenant 10.

E. **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:

(i)   the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii)   any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender;

(iii)   termination of professional management and assumption of self-management of the Owners Association; or

(iv)   any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.**

_____ (Seal)
DR. IGNATIUS AKPELE                      -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

_____ (Seal)
                                                        -Borrower

-7 (9108).01                          Page 2 of 2                          Form 3150 9/90

BOOK 26964 PAGE 211

KS (9)

26964
0212

GEORGIA -

GRANTOR: DR. IGNATIUS AKPELE

LENDER: Fidelity National Mortgage Corp

DATE OF SECURITY DEED: May 6, 1999

## WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; (2) WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR:

Signed, Sealed and delivered in the presence of:

DR. IGNATIUS AKPELE          (Seal) -Grantor

_____ (Seal) -Grantor

Notary Public

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Deed to Secure Debt and "Waiver of the Borrower's Rights" by the Borrower(s), I reviewed with and explained to the Borrower(s) the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights. After said review with and explanation to Borrower(s), Borrower(s) executed the Deed to Secure Debt and "Waiver of Borrower's Rights."

Based on said review with and explanation to the Borrower(s), it is my opinion that Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me DR. IGNATIUS AKPELE     BOOK 26964 PAGE 212

on the date set forth above.

Notary Public                          Closing Attorney

## FORECLOSURE CLOSING DISCLOSURE

O.C.G.A. Section 7-1-1014(2) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.

DR. IGNATIUS AKPELE

960(GA) 9401.02  MW 01/94        VMP MORTGAGE FORMS - (800)521-7291        1/94

KS (10)